ABRAHAM LEVINE et al., Appellants, v CHESAPEAKE AND OHIO
RAILROAD COMPANY et al., Respondents, et al., Defendants.

First Department, December 20, 1977

### APPEARANCES OF COUNSEL

*Sidney B. Silverman* of counsel *(Joan T. Harnes* and *Martin H. Olesh* with him on the brief; *Silverman & Harnes* and *Levy & Sonet,* attorneys), for appellants.

*Louis C. Lustenberger, Jr.,* of counsel *(John P. Hennigan, Jr.,* with him on the brief; *Donovan Leisure Newton & Irvine,* attorneys), for respondents.

**OPINION OF THE COURT**

SILVERMAN, J.

Plaintiffs appeal from an order of the Supreme Court dismissing the complaint pursuant to CPLR 3211 (subd [a], par 7) for failure to state a cause of action, and denying plaintiffs' motion for class action certification, pursuant to CPLR 902, as moot. We affirm.

Plaintiffs are the holders of $644,000 face amount of convertible 4½% income bonds issued by Baltimore & Ohio Railroad Company ("B&O"). These income bonds were issued pursuant to a supplemental indenture dated March 13, 1946 between B&O and Bank of the Manhattan Company, as trustee. By the terms of that indenture, each $1,000 convertible bond was exchangeable at the holder's option for 10 shares of the common stock of B&O. The present action is based on the claimed destruction by the defendants of the value of that conversion right, by reason of the following facts:

In 1960, defendant Chesapeake and Ohio Railroad Company ("C&O") made a public offer to acquire stock of B&O by an exchange for C&O stock. This exchange offer was approved by the Interstate Commerce Commission on or about December 17, 1962. (See *Chesapeake & Ohio Ry. Co. Control-Baltimore & Ohio R. R. Co.,* 317 ICC [Finance Reports] 261.) The application thus approved by the ICC was to acquire control of B&O through acquisition of its capital stock by an offer to all B&O stockholders. As a result of this offer, as well as open market purchases of stock by C&O, by 1961 the holders of approximately 61% of B&O's stock had accepted the exchange offer *(id.,* p 267). Thereafter C&O continued to purchase B&O stock in the open market and by 1964 C&O had acquired 90% of B&O's common stock. From 1964 to 1972 C&O acquired an additional 5% of B&O's common stock. In 1973, pursuant to the settlement of a class action in the United States District Court for the Southern District of New York, brought on behalf of B&O's minority stockholders, C&O made a new offer to B&O's minority stockholders and under that offer C&O acquired an additional 4.63%, bringing its total holdings of B&O stock to 99.63%. (In June, 1973, all of C&O's publicly held common stock was exchanged for stock of Chessie System, Inc. ["Chessie"].) It is alleged that with the exception of one shareholder, all the stock of B&O is now held by C&O and another subsidiary of Chessie.

It is obvious that there is no present market for B&O stock,

as apparently the two holders of B&O stock (Chessie and its subsidiaries with 99.63% and the other stockholder) are not selling. However, it is alleged that C&O continues to have outstanding a public offer to buy B&O stock at $35 per share.

The complaint alleges that since C&O acquired virtually all of B&O's stock (i.e., June 15, 1973), B&O has had substantial earnings; thus while in 1971 B&O had a loss of $38,000,000 and in 1972 earnings of only $5,500,000 (equal to about $2.50 per share); in 1973 B&O had earnings of $25,000,000 (equal to about $10 per share); and in 1974 $53,000,000 (or about $20 per share).

The great increase in B&O's earnings is of course essentially due to the energy and oil crisis which became dramatically evident in 1973 because of the oil embargo, and the fivefold increase in the price of oil and the accompanying impetus for industry to change to other sources of energy—specifically coal. And B&O's prosperity depends on coal.

The complaint alleges that if an active market for B&O stock had existed in 1974 such stock would have sold for at least $300 per share, and since the convertible bonds can be exchanged for 10 shares of B&O common stock, each such bond would have been selling for at least $3,000; instead the convertible bonds sold in 1974 at a high of $560 per bond and a low of $410.

On the argument of this appeal, plaintiffs disclaimed seeking the right to exchange for Chessie stock. And there is no dispute that B&O stands ready to issue 10 shares of B&O stock for each bond. What plaintiffs seek in this action is money damages for the damage to their right of conversion by reason of the elimination of any public market for B&O's common stock.

Various defenses are urged, among them that under the terms of the "no action" clause of the supplemental indenture, no action can be brought by the bondholders for this relief except upon the request of the holders of 25% of the outstanding bonds; that the approval by the Interstate Commerce Commission of the acquisition of B&O stock by C&O renders the transaction immune by virtue of Federal law from any attack in the State courts; and that defendants do no stand in any fiduciary relationship to plaintiffs.

Without passing on any of these defenses, we affirm the dismissal of the complaint because we think there was no actionable unfairness to plaintiffs in these transactions.

The controlling fact here appears to be that later unforeseen economic changes have altered the perception of the parties as to the desirability of previous transactions which were fair when they took place.

Here the acquisition by C&O of B&O's stock began in 1960, long before the oil crisis of 1973 turned B&O into a profitable operation. By 1962, C&O had acquired 90% of B&O's common stock; by 1972, it had acquired 95%. There appears to be no suggestion there was anything unfair about these acquisitions by C&O at the time. Indeed, as we have said, much of this stock was acquired pursuant to an exchange offer which had been approved by the Interstate Commerce Commission. Thus C&O already had at least 95% of the stock of B&O before the oil crisis of 1973 increased the earnings of B&O to a point where plaintiffs' conversion rights became significant.

Thereafter C&O's only additional acquisition of B&O stock was 4.63% acquired pursuant to an exchange offer made as part of an arm's length settlement approved by the United States District Court in a class action brought on behalf of B&O's minority stockholders. We do not think plaintiffs have the right to attack collaterally that approval in this action and to ask us to say that the United States District Court was inadequately informed when it approved the fairness of that offer.

We thus have a situation in which the fairness of C&O's acquisition of B&O's stock is established for our purposes. All that has happened since then is that supervening economic changes now make C&O's acquisition of B&O's stock seem like a bargain for C&O and make the conversion rights important if there were a public market for B&O common stock.

We do not think that such a consideration invalidates C&O's acquisition of substantially all the B&O stock on terms that were fair at the time, even though the inevitable consequence of the acquisition by one economic interest or entity of substantially all the stock of a company necessarily means that there is no longer a public market for that stock. We note that the exchange offers were available to all stockholders. Plaintiffs had the right at any time to convert their bonds into stock, and if they had chosen to do so, the exchange offers were available to them. Plaintiffs preferred, perhaps quite sensibly, not to make the exchange before 1973. Perhaps prior to the oil crisis the exchange of a $1,000 bond for 10 shares of B&O common stock was economically unattractive. Whatever

the reasons, plaintiffs preferred to hold on to their bonds, with whatever speculative possibility there might have been in the conversion privilege, whose value of course would depend on what happened to the stock. They preferred not to exchange in the face of the publicly known increasing acquisition by C& O of B&O stock with the steadily decreasing number of publicly held shares available for trade in the public market. The stock had both positive and negative developments; with the oil crisis, the earnings went up; with the decline in the number of shares, the liquidity went down. That was the chance plaintiffs took. We see no unfairness.

*Jones v Ahmanson & Co.* (1 Cal 3d 93) relied upon by plaintiffs seems to us distinguishable. In that case, the controlling stockholders transferred their stock into a company whose stock was publicly traded without giving the minority stockholders the opportunity to do the same thing, thus leaving them with a stock that had no market. That is not this case. The same offers were publicly made to all stockholders and were available to plaintiffs.

We therefore think the complaint does not state a cause of action.

With this determination, the claim for class action relief becomes moot, as the Special Term held.

The order of the Supreme Court, Bronx County (DI FEDE, J.), entered May 5, 1977, granting the motion to dismiss the complaint, and denying plaintiffs' motion for class action determination, should be affirmed, with costs.

LUPIANO, J. P., BIRNS and EVANS, JJ., concur.

Order, Supreme Court, Bronx County, entered on May 5, 1977, unanimously affirmed. Defendants-respondents shall recover of plaintiffs-appellants $60 costs and disbursements of this appeal.