[Civ. No. 53666. Second Dist., Div. Four. May 1, 1979.]

ROBERT KESSLER, Plaintiff and Appellant, v.
GENERAL CABLE CORPORATION et al.,
Defendants and Respondents.

534

COUNSEL

Baltaxe, Rutkin & Klein, George Baltaxe and Theodore Field for Plaintiff and Appellant.

Pillsbury, Madison & Sutro, John B. Bates, John A. Sutro, Jr., Walter R. Allan, Latham & Watkins, A. Victor Antola and Kenneth W. Oder for Defendants and Respondents.

OPINION

JEFFERSON (Bernard), J.—Plaintiff Robert Kessler, the holder of $10,000 in convertible debentures issued by defendant Sprague Electric Company, on behalf of himself and other debenture holders similarly situated, filed an action against Sprague, a Massachusetts corporation, General Cable Corporation, a New Jersey corporation, and numerous Doe defendants. This complaint sought damages for violation of California Corporate Securities Act, for breach of contract, for breach of fiduciary relationship, and for declaratory relief. The corporate defend-

ants filed answers to the complaint and obtained some discovery through interrogatories. Each corporate defendant then filed a motion for summary judgment.

In addition to opposing the summary judgment motions, plaintiff moved to file a first amended complaint. At the single hearing on the motions for summary judgment and the motion to file a first amended complaint, the parties stipulated that written affidavits and exhibits submitted by defendants should be admitted into evidence. The parties also stipulated that plaintiff's motion for leave to file a first amended complaint should be granted and that defendants' motions for summary judgment were to be deemed directed to the first amended complaint.

The first amended complaint also alleged breach of contract, a violation of the California Corporate Securities Act, a breach of fiduciary relationship and, in a cause of action directed at defendant General Cable, a "breach of prospective advantage." Added as defendants in the first amended complaint were numerous officers and directors of the corporate defendants who made the motions for summary judgment.

At the hearing on the motions for summary judgment the parties orally stipulated that, insofar as these motions were concerned, there were no triable issues as to any material fact before the court and, hence, the motions could be determined as a matter of law. The court granted the summary judgment motions and a judgment was accordingly entered for the two corporate defendants. Plaintiff has appealed from the judgment.

A preliminary dispute between the parties on appeal concerns the nature and effect of the judgment entered below. Plaintiff takes the position that the trial court's determination was solely of a question of law, i.e., the viability of plaintiff's amended complaint in stating a cause—or causes—of action against defendants, a determination that may appropriately be made by demurrer. Defendants point out that the trial court granted a motion for summary judgment, encompassing not only the determination of legal issues but the absence of triable issues of fact as well. A demurrer, of course, admits facts well pleaded; defendants stress that they took issue with plaintiff's factual assertions below, particularly with respect to the issue of damages.

We perceive the issues raised by the amended complaint as both legal and factual. ■ While a question of law is appropriately determined on demurrer, "such defect is not waived by the failure to raise it by

demurrer and may be considered in the context of a motion for summary judgment." (*Bowden* v. *Robinson* (1977) 67 Cal.App.3d 705, 710 [136 Cal.Rptr. 871].) In addition, however, our review must be conducted pursuant to the well established principles which guide summary judgment proceedings. It is well understood that the primary purpose of such proceedings is to ascertain the existence of triable issues of fact from a record which includes but is not limited to "affidavits, declarations, admissions, answers to interrogatories, . . ." (See, generally, Code Civ. Proc., § 437c; *Chern* v. *Bank of America* (1976) 15 Cal.3d 866, 873 [127 Cal.Rptr. 110, 544 P.2d 1310]; *DeSuza* v. *Andersack* (1976) 63 Cal.App.3d 694, 698 [133 Cal.Rptr. 920].)

Certain facts which generated this dispute are uncontroverted. Plaintiff Kessler acquired Sprague's convertible debentures in December 1974. Sprague had described the debentures in this particular issue in a prospectus dated September 27, 1967, offering $25 million of them to investors at an interest rate of 4¼ percent. By the indenture agreement dated October 1, 1967, the holder of debentures issued under the agreement could convert them to the common stock of Sprague "at the rate of 21.978 Common Shares for each $1,000 principal amount of Debentures, or, in case an adjustment in the conversion rate has taken place pursuant to the provisions of Section 1304, then at the applicable conversion rate as so adjusted, . . ." At the stated conversion rate, the cost of each share of common stock would be $45.50.

The indenture agreement provided for certain protection of the debenture holders, by reserving sufficient common stock to enable the corporation to respond to exercise of the conversion option, and a sinking fund available for redemption of the debentures. The indenture agreement also provided for preservation of the rights of the debenture holders in the event of consolidation, merger or conveyance of corporate assets. The debentures so issued were of 25 years' duration, payable in 1992. The debentures could be redeemed by the corporation prior to that time at the corporation's election. Prior to that redemption by election or the passage of the stated time, the holder could exercise his right of conversion to common stock.

On November 12, 1976, defendant General Cable Corporation made a tender offer to the shareholders of Sprague, offering to purchase all of the publicly held shares of Sprague common stock for $19.50 per share, a price above the market price for the stock at that time. The offer was also made to purchase the stock held by officers, directors and employees of Sprague, and to purchase certain stock options held by them at the same

price. The Sprague board of directors recommended to their shareholders acceptance of the tender offer. By the end of 1976, defendant General Cable had acquired 96.3 percent of the total outstanding common stock of Sprague, an objective undertaken to expand and diversify General Cable's corporate enterprise.

As a result of General Cable's acquisition of Sprague's common stock, the common stock of Sprague, and the 1967 Sprague debentures were delisted from the New York Stock Exchange (NYSE) on January 4, 1977, because these securities no longer met NYSE requirements concerning the level of public ownership by participating corporations.

In essence, in the case before us, plaintiff is complaining that the acquisition of almost all of Sprague's common stock by General Cable Corporation, and the subsequent removal of Sprague's stock and debentures from the NYSE, has deprived plaintiff and other debenture holders of a public market for their debentures and for Sprague's common stock. Plaintiff points out that the delisting of these securities from NYSE has limited sales of these securities to over-the-counter transactions. Plaintiff argues that, as a result, the market has been reduced to the point where it will never be profitable for holders of Sprague debentures to convert the debentures to Sprague common stock because the price of Sprague common stock will never increase sufficiently to make exercise of the conversion right meaningful. Thus, plaintiff asserts, the conversion right has in effect been destroyed, and the debenture holders have been deprived of one of the potential "benefits of the bargain" offered to such investors to persuade them to participate in the transaction of purchasing convertible debentures.

Plaintiff's suit constitutes an effort, in California at least, to clarify the various rights and duties which result from the issuance of corporate convertible debentures; to specifically ascertain the status of rights of conversion contained in such debentures; and to identify what relief, if any, is available to the holder of a conversion right which is in jeopardy or which has been diminished in value by corporate conduct. Plaintiff's amended complaint, which alleged five causes of action, sought rescission or compensatory damages as well as punitive damages of $25 million.

The corporate defendants' response is two-fold. First, they deny that a corporation owes any duty to debenture holders which exceeds that owed to any creditor of the corporation pursuant to the credit instrument and, secondly, they deny that these particular defendants had, during the course of conducting corporate affairs, either intentionally or otherwise

caused the plaintiff (or other similarly situated debenture holders) damage; this second line of defense was buttressed by the introduction of evidence below in the form of the affidavits of the presidents of the two corporate defendants, and other materials.

Before addressing the five causes of action alleged in plaintiff's amended complaint, some discussion is necessary relating to the legal status—past and present—of convertible debentures and holders of such debentures.

■ A debenture represents, primarily, evidence of debt owed by the issuer to the holder, and a corporate debenture or bond is one issued by a corporation. As Fletcher notes, "[b]onds are to be distinguished from stock, in that the distinguishing feature of bonds is the obligation [of the corporation] to pay a fixed sum of money with stated interest, while the distinguishing feature of stock is that it confers upon its holder a part ownership of the assets of the corporation and gives the holder a right to participate in the management of the corporation and to share in the surplus profits and on dissolution to share in the assets which remain after the debts are paid." (6A Fletcher, Cyclopedia of the Law of Private Corporation (Permanent ed., 1968 revision), § 2635, p. 5.)

Debentures are serial obligations or notes representing indebtedness but are not ordinarily secured by any specific mortgage, lien or pledge of security; rather, they are issued on a corporation's credit and pursuant to a trust indenture whereby a trustee undertakes supervision of the issue (including protection of the bondholders). (Fletcher, *supra*, § 2636, p. 7.) A debenture, unlike a share of stock, is evidence of corporate indebtedness, and a convertible debenture is simply a debenture convertible into stock under certain conditions.

Conversion has been described as "the act of exchanging one class of securities for another, the conversion right being created by written contract between the holder of the security and the company which issued it." (Fleischer & Cary, *The Taxation of Convertible Bonds and Stock* (1961) 74 Harv.L.Rev. 473.)[1]

Convertible debentures have long been issued in the United States, playing a part of the funding required in our initial industrial expansion and particularly used in the building of railroads during our early history. Such debentures are very popular today, and are presented to the investor

[1]Convertible debentures should be distinguished from stock warrants, which may be detachable from stock and consequently be valued separately.

in "almost infinite variety . . . . [T]he types and features are limited only by the ingenuity of their creators." (Katzin, *Financial and Legal Problems in the Use of Convertible Securities* (1969) 24 Bus.Law., 359, 360.) They are issued for a variety of reasons, such as to raise new capital, to facilitate a merger or recapitalization, and to fund venture capital situations. (Katzin, *supra*, p. 360.) Ordinarily, a convertible debenture is offered at a lower rate of interest than nonconvertible debentures. The investor in effect gambles that the price of the stock to which the debenture may be converted will appreciate sufficiently in value to allow profitable exercise of the conversion right at the given rate and compensate for the lesser interest received in the meantime.

Insofar as we have been able to discover, no California court has attempted to define the limits of protection offered to holders of such a right of conversion. Two early out-of-state decisions, however, illustrated the fact that the conversion privilege has not traditionally been one readily recognized by and protected by the courts. (See *Parkinson* v. *West End St. Ry. Co.* (1899) 173 Mass. 446 [53 N.E. 891], and *Lisman* v. *Milwaukee, L. S. & W. Ry. Co.* (E.D.Wisc. 1908) 161 F. 472.) In *Parkinson,* Justice Holmes declared that "[the conversion right] is simply an option to take stock as it may turn out to be when the time for choice arrives. The bondholder does not become a stockholder, by his contract, in equity any more than at law." (53 N.E. 891, 892.) In both *Parkinson* and *Lisman,* no remedy was afforded holders of debentures with rights of conversion when the issuer of that right had disappeared before the right could be exercised.

In 1930, Hills, discussing *Convertible Securities* in 19 Cal. L. Rev. 1, at page 31, stated his conclusion that "[p]rivilege holders have practically no rights upon a termination of the corporate existence of the company which granted the privilege, whether it terminates by reason of a consolidation, merger, dissolution or otherwise." The commentator expressed the view that holders of debentures must rely upon protective corporate drafting rather than the courts.

As a result of the economic chaos experienced during the Depression, Congress addressed itself to the problem of providing some protection for the corporate investor without hampering corporate efforts toward business recovery.[2] The Securities Exchange Act of 1934 (15 U.S.C.A. § 78) was enacted "to provide for the regulation and control of

---

[2]One such piece of legislation was the Trust Indenture Act of 1939 (15 U.S.C.A. § 77aaa), which was "directed toward assuring to holders of debt securities the services of a disinterested indenture trustee, who would observe high standards of conduct in

transactions in securities conducted in securities exchanges and over-the-counter markets." (Davis, *Hoff and Harff: Does the Convertible Debenture Holder Have Standing to Maintain a Shareholder Derivative Action?* 26 Syracuse L.Rev. 730, 739-740.) In that legislation, a very broad definition was given to "equity security," as opposed to "debt security"—the difference being that the holder of the former conceivably has the requisite "proprietary" interest to seek redress for corporate misconduct. In pertinent part, "equity security" was defined as "any stock or similar security; or any security convertible, with or without consideration, into such a security, or carrying any warrant or right to subscribe to or purchase such a security; . . ." The section goes on to confer upon the Securities Exchange Commission the right to identify such securities as they deem "necessary or appropriate" as equity securities. (15 U.S.C.A. § 78c(a)(11).)

This section has been interpreted in the federal system as broadening the rights of holders of convertible debentures, although it cannot be said that such interpretation is generally recognized in federal or state cases. (For examples of the broadened approach, see *Entel* v. *Guilden* (S.D.N.Y. 1963) 223 F.Supp. 129; *Hoff* v. *Sprayragen* (S.D.N.Y. 1971) 52 F.R.D. 243.) The view remains, generally, that holders of debentures, with an option to convert, remain corporate creditors only, without any special status which affords them the opportunity to litigate in the area of potential damage to their economic interests. (See, *Helvering* v. *Southwest Corp.* (1942) 315 U.S. 194 [86 L.Ed. 789, 62 S.Ct. 546]; *Harff* v. *Kerkorian* (Del. Ch. 1974) 324 A.2d 215; *Kusner* v. *First Pennsylvania Corporation* (E.D.Pa. 1975) 395 F.Supp. 276; *In re Will of Migel* (1972) 71 Misc.2d 640 [336 N.Y.S.2d 376]; *Levine* v. *Chesapeake & O.R. Co.* (1977) 60 App.Div.2d 246 [400 N.Y.S.2d 76].)

The cited cases arose in varying contexts, but demonstrate that the impact of bondholders upon corporate conduct remains to be recognized. In the instant case, plaintiff has relied heavily on the recognition of the problem by law review commentators; a typical argument made therein is that "[a]lthough convertible securities are difficult to classify conclusively as either a debt or an equity security, since they are a hybrid of both," they are frequently issued to raise capital, and should be afforded the protection given other equity securities by such legislation as the Securities Exchange Act of 1934. (See Davis, *supra,* pp. 751-753.)

protecting their interests." (Friedman, *Updating the Trust Indenture Act,* (1974) 7 U.Mich.J. L. Ref. 329.) Nothing was included in that act, however, that has been interpreted as affording holders of debentures the status of corporate shareholders.

We turn to an analysis of plaintiff's amended complaint.

*The First Cause of Action*

■ The first theory of liability advanced against defendant Sprague was based upon the fact that the prospectus, issued in 1967 by Sprague with respect to the convertible debentures involved herein, declared that application had been made to list the debentures on the New York Stock Exchange. Plaintiff viewed this declaration as an implied continuing promise that the debentures, once listed on the Exchange, would continue to be so listed; that their delisting, caused by General Cable's acquisition of Sprague stock, was a breach of that promise for which damages are payable. The trial court rejected the theory, finding no implied continuing promise in the prospectus.

We have examined the prospectus which is included in the record on appeal. Nothing in the language of the prospectus appears with respect to the stock exchange listing, except to state it was being sought—a statement apparently true. Unless a promise to continue the New York Stock Exchange listing may be implied, plaintiff has not stated a cause of action.

■ It is the law in California that, generally, a strict test is applied in determining whether or not an agreement—or a representation—carries with it an implied covenant or promise, *i.e.,* one not expressed by the parties directly. (See 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 574, pp. 490-492.) It has been said that implied covenants are not favored in the law, although some courts have been more liberally inclined than others in interpreting a contract as including implied terms. (See, e.g., *Addiego* v. *Hill* (1965) 238 Cal.App.2d 842, 846 [48 Cal.Rptr. 240].) ■ A recent case summarized the conditions under which an implied covenant would be recognized as follows: "[I]t has been held that covenants or terms in an agreement may be implied only if the following conditions are met: (1) the implication must arise from the language used or it must be indispensable to effectuate the intention of the parties; (2) it must appear from the language used that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it; (3) implied covenants can only be justified on the grounds of legal necessity; (4) a promise can be implied only where it can be rightfully assumed that it would have been made if attention had been called to it; and (5) there can be no implied covenant where the subject is completely covered by the contract. [Citations.]" (*Hinckley* v. *Bechtel Corp.* (1974) 41 Cal.App.3d 206, 211 [116 Cal.Rptr. 33].)

These rather strict standards negate the conclusion that the brief reference to listing on the New York Stock Exchange, set forth in the prospectus, constituted a *continuing* promise to avoid delisting, for whatever reason, for the 25-year period of the convertible debentures in question; nor do we believe that any reasonable investor would have so interpreted it. Obviously, many changes could occur over such a length of time. Nor was the particular stock exchange listing indispensable to the contractual purpose—that of raising capital by affording the investor interest and certain redemption as well as the possible alternative of conversion into stock for a profit at some time in the future.

It is essential to plaintiff's first cause of action to make the assumption that delisting of the stock on a public exchange would be the *primary* cause of lower common stock prices in the long run, thus destroying the possibility of a profitable conversion. In the context of the summary judgment proceedings below, the defendants introduced evidence that both the price of Sprague common stock and the price of the debentures had *risen* substantially in over-the-counter trading since the acquisition of Sprague stock by General Cable. Under the circumstances, therefore, allegations by plaintiff of long range loss were merely speculative.

Plaintiff relies on *Sonesta Int'l. Hotels Corp.* v. *Wellington Associates* (2d Cir. 1973) 483 F.2d 247, a case that involved a dispute concerning the attempted takeover of Sonesta by the defendants. It was stated there that a factor of decision (protecting Sonesta) was that "[l]oss of listing on the Exchange [NYSE] would deprive Sonesta shareholders of a ready market for their shares and of the protection of certain Exchange requirements, including its disclosure rules." (*Id.,* at p. 254.) Despite the language of *Sonesta,* there is no California authority mandating that a corporation must maintain a particular public market for shareholders or debenture holders.

The language of *Jones* v. *H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 115 [81 Cal.Rptr. 592, 460 P.2d 464], tells us that, while the California Supreme Court accepts the premise that majority stockholders owe a fiduciary duty to minority stockholders, "we do not suggest that the duties of corporate fiduciaries include . . . an obligation to make a market for and to facilitate public trading in the stock of the corporation."

■ We thus hold that the prospectus could not reasonably be interpreted to contain either a misrepresentation of present fact or a continuing implied promise to maintain a New York Stock Exchange listing throughout the life of Sprague's convertible debentures. Conse-

quently, plaintiff's first cause of action fails to allege facts constituting a cause of action for recovery of damages.

### The Second Cause of Action

The second cause of action also concerned the delisting of Sprague common stock and debentures from the New York Stock Exchange. Plaintiff advanced the theory in the allegations of the second cause of action that there was a "misrepresentation" as to stock exchange listing which constituted a violation of the California Corporate Securities Law of 1968. (Corp. Code, § 25400 et seq.) In *Goodman* v. *Kennedy* (1976) 18 Cal.3d 335, 345 [134 Cal.Rptr. 375, 556 P.2d 737], the California Supreme Court explained that "[s]ection 25400, subdivision (d) [of the Corporations Code], makes it unlawful for the purpose of inducing the purchase of stock to make any statement which (1) *is false or misleading with respect to any material fact* or (2) *omits material facts necessary to make the statement not misleading.* Section 25401 makes it unlawful to sell a security by means of a communication that includes such a statement. A party injured by violations of the provisions may recover damages. (Corp. Code, §§ 25500, 25501.) [¶] These provisions became effective on January 2, 1969, and do not apply to legal proceedings 'on the basis of facts or circumstances occurring before [this] effective date.' (Corp. Code, § 25704, subd. (a).)" (Italics added.)

As we have discussed previously herein, we find no misstatement of a material fact in the prospectus, and thus no violation of the pertinent sections of the Act.[3]

### The Third Cause of Action

In plaintiff's third cause of action, it was alleged that defendant Sprague had breached the indenture agreement of October 1, 1967, in connection with the rights of conversion described in the 13th article therein, and also referred to in section 902 of that agreement.

Section 902 provides for supplemental indentures with the consent of the holders, and declares that "no such supplemental indenture shall, without the consent of the Holder of each Outstanding Debenture

---

[3]We thus find no occasion to decide such questions as whether plaintiff, acquiring the securities in 1974, could qualify as a "party injured by violations of the provisions"; whether acquisition after the effective date of the legislation would constitute a "sale" within the meaning of section 25401, or whether an action would be barred because the prospectus was issued before the effective date of the legislation.

affected thereby, . . . (2) adversely affect the conversion rights of the Holders under Article Thirteen, . . ." Article thirteen of the indenture agreement recites the details of the conversion privilege, and the manner in which it may be exercised prior to redemption; in section 1306 of the indenture agreement, specific provisions are directed toward the protection of the debenture holders in the event of consolidation or merger of the issuer, Sprague, and article eight thereof sets forth the conditions under which the corporation may consolidate, merge, or convey corporate assets.

Plaintiff contends that, from section 902 of the indenture agreement, there should be inferred an implied covenant of good faith and fair dealing by Sprague not to do anything that would deprive a debenture holder of the benefits of his bargain, although the expressed intent of section 902 is to set forth the methods to be employed and the applicable standards for future modifications of the initial agreement.

The concept of "good faith and fair dealing" as an implied term of a contract has been recognized for some years in California law. It was observed in *Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 658 [328 P.2d 198, 68 A.L.R.2d 883], that "[t]here is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." While it has been employed primarily in the case law with respect to the rights and duties arising out of contracts of insurance, it is understood that the principle has wider application, particularly with respect to any contract of adhesion where superior bargaining power comes into play.

We note that in the case of a convertible debenture, one of the potential benefits of the bargain is uncertain, i.e., a rise in the price of the security to which the conversion right could be applied. Undoubtedly, this is a *possible* outcome, but one upon which the investor knowledgeably gambles. The risk involved is voluntarily undertaken in lieu of making another type of investment. We do not regard such an investor as occupying an inferior bargaining position vis-à-vis the corporate issuer, as he may shop in a market which offers debentures with a variety of features. Invoking the covenant of good faith and fair dealing cannot logically be regarded as a means for providing any party to a contract with *complete* continuing security.

In the case at bench plaintiff has made no showing that he and other debenture holders have lost the benefits of their bargain because of any

demonstrated misconduct on the part of the defendants. The evidence adduced below established that there had been no diminution in the value of plaintiff's investment since the acquisition, and, in fact, that the value had substantially increased. It would be highly speculative and conjectural to attempt to measure what the ultimate value of the stock and bonds would have been if the acquisition had not taken place.

In addition, plaintiff did not attempt to demonstrate that defendants have in any way breached the indenture agreement; the reservation of stock, and the sinking fund for redemption remain, despite the acquisition. We find no violation of the implied covenant of good faith and fair dealing included in contracts generally, and no breach of the indenture agreement by the defendants.

### The Fourth Cause of Action ·

■ Plaintiff sought, in his fourth cause of action, to establish the principle that Sprague had, by its conduct, breached a fiduciary duty owed to debenture holders of the corporation. The declaration of such a principle, based on the record before us, would constitute an expansion of present law on the subject—an expansion at divergence with much of the current case law. Within the context of the present case, we find no basis for imposing fiduciary responsibility upon corporations with respect to their creditors.

### The Fifth Cause of Action

■ Plaintiff alleged that the conduct of defendant General Cable Corporation, in acquiring most of the common stock of Sprague, had breached a duty owed of noninterference with prospective economic advantage. We presume that plaintiff was referring to the tort broadly described as "intentional interference with advantageous business relationship." (See *Buckaloo* v. *Johnson* (1975) 14 Cal.3d 815 [122 Cal.Rptr. 745, 537 P.2d 865]; see, also, Prosser on Torts (4th ed. 1971) § 130, p. 949.) It was stated in *Buckaloo* that "[t]his tort, although infrequently · invoked, is not new to the law. . . ." (*Buckaloo, supra,* 14 Cal.3d 815, 822.)

Prosser notes that the essential elements of the tort are an *intention* to interfere and resulting damage; it can be defended against by claiming privilege, one species of which relates to the freedom to conduct competitive business enterprise. (Prosser, *supra.*) Plaintiff's fifth cause of action did not allege any intention on Sprague's part except the allegation

that such intentional interference resulted from Sprague's tender offer with knowledge that delistment of the common stock and debentures of Sprague would result since the tender offer did not provide any benefits to the debenture holders.

In addition, plaintiff did not controvert the evidence showing a substantial rise in the value of his investment. As Prosser tells us, often such claims founder because there is "no sufficient degree of certainty that the plaintiff ever would have received the anticipated benefits." (Prosser, *supra,* p. 950.)

A basic conceptual problem encountered in the case at bench is that of assigning a value to a conversion right contained in a convertible debenture in order to determine, with any degree of certainty, the damages occasioned by the loss of the right, assuming some diminution in value were to be established. The defendants, mindful of their obligation in summary judgment proceedings of successfully controverting every material fact alleged by the plaintiff in order to obtain summary judgment in their favor (*Residents of Beverly Glen, Inc.* v. *City of Los Angeles* (1973) 34 Cal.App.3d 117 [109 Cal.Rptr. 724]) did so, including those facts relative to damages.

The judgment is affirmed.

Files, P. J., and Kingsley, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 27, 1979.