[No. B052941. Second Dist., Div. Three. May 29, 1992.]

STEVEN PITTELMAN, Plaintiff and Appellant, v.
M. LEE PEARCE et al., Defendants and Respondents.

**COUNSEL**

Clemens, Glassman & Clemens, Michael S. Glassman, Kathleen Clemens, Pomerantz, Levy, Haudek, Block & Grossman, Stanley M. Grossman, Shaheen Rushd and Jeffrey C. Block for Plaintiff and Appellant.

Quinn, Emanuel & Urquhart, A. William Urquhart, Karen A. Rooney, Carol A. Stickels, Skadden, Arps, Slate, Meagher & Flom, Michael H. Diamond and Jeffrey B. Valle for Defendants and Respondents.

OPINION

**CROSKEY, Acting P. J.**—Plaintiff, Steven Pittelman, appeals from a summary judgment entered in favor of the defendants, American Medical International Inc., a Delaware corporation (AMI), and its directors[1] on his class action complaint filed on behalf of himself and other debenture holders. As we conclude that there is no fiduciary duty owed to debenture holders and there is no claim that the terms of the debenture have been breached, summary judgment was proper. We therefore affirm.

FACTUAL AND PROCEDURAL BACKGROUND

The relevant facts in this case are neither complicated nor extensive; nor is there any essential dispute between the parties as to the events from which this dispute arose.

In 1986, plaintiff purchased one of the 25-year, 8¼ percent convertible subordinated debentures issued by AMI in 1983.[2] By their terms, these debentures, which were issued by AMI to raise $100 million in debt financing, are due on April 1, 2008 (with interest payable semiannually on Apr. 1 and Oct. 1 of each year). Upon their issuance, these bonds each had a face value of $1,000 and an "investment grade" credit rating.[3]

In 1989, AMI was acquired in a leveraged acquisition by defendant IMA Acquisition Corporation (IMA). A "leveraged" purchase is one which is accomplished by heavy reliance on debt financing. Such was the case with the purchase of AMI. In order to acquire the stock of AMI, financing sufficient to fund a tender offer of $26.50 per share for at least 86 percent of the outstanding common shares was required. IMA borrowed $1.72 billion from a consortium of banks and $713 million from the sale of high yield or

---

[1] The directors of AMI who are named as defendants herein are M. Lee Pearce, Richard A. Gilleland, Royce Diener, Donald E. Guinn, James B. Jacobson, Morton H. Meyerson, Bernard Schriever, Rocco C. Siciliano, S. Jerome Tamkin, Harold M. Williams, U.J. Appel, Thomas P. Nickell, Jr., Henry Rosovsky and Thomas B. Walker, Jr. They are herein collectively referred to as the "defendant directors." Additional defendants include IMA acquisition Corp., IMA Holdings Corp., Harry Gray, Mel Klein & Partners Corp., Harry Gray, Mel Klein & Partners L.P. and First Boston Investment, Inc.

[2] The terms of the debenture provided that each bond could be converted to 25 shares of common stock at a price, subject to certain adjustments not here relevant, of $40 per share.

[3] At issuance, Standard & Poor's Corporation (S & P) had rated the debentures Triple B Minus. S & P defined a bond with this rating as "being investment grade" and with "no known factors to prevent timely payment of debt service."

:"junk" bonds.[4] The acquisition plan also contemplated that following the tender offer there would be a merger of AMI into an affiliate of IMA. Most significantly, the substantial debt of more than $2 billion would become the obligation of AMI after the merger.[5]

The defendant directors accepted the tender offer and related merger agreement on October 7, 1989, and the agreements were entered into on October 8. Prior to their consent to the acquisition, the defendant directors caused AMI to transfer $58 million of its cash into trust funds to insure performance by AMI of the various financial obligations and contractual entitlements contained in the employment benefit packages for senior managers. The acquisition was approved by the defendant directors only after IMA agreed to honor these trust fund arrangements.[6] No special action was taken, however, to protect the investment interests of the holders of the 8¼ percent debentures.

As a result of this significant change in AMI's debt condition and substantially increased interest burden, it was necessary for AMI to consider the liquidation of certain operations and sale of substantial assets. These circumstances had a negative impact on the market value of the 8¼ percent debentures. Following the merger the credit rating for the debentures was changed from Triple B Minus to Single B. S & P defined this lower rating as one used to describe "speculative grade securities" issued by a debtor which had "a speculative capacity to pay debt service because of the existence of negative factors or uncertainties for which there are no compensating positive factors."[7]

On March 29, 1989, plaintiff filed this class action seeking to enjoin and prevent this transaction. Plaintiff alleged that the debt financed acquisition of

---

[4]The interest rates imposed on this financing ranged from 16.75 percent to 24 percent. In addition, the purchasers of the junk bonds apparently demanded and received certain protective covenants designed to shield their interests if events subsequently occurred which further increased their risks.

[5]We have set forth only the essentials of this obviously complicated transaction. However, nothing more detailed is required in order for us to examine the issues raised by plaintiff's appeal.

[6]However, defendants insist that such trust funds were never placed beyond the reach of AMI's creditors (including bondholders) in the event of corporate insolvency.

[7]S & P explained the downgrading in October 1989 in the following terms:

"The actions reflect the acquisition of AMI by IMA . . . in a $3.4 billion leveraged buyout. With about $2 billion of additional debt immediately following the buyout, the new entity will exhibit slim cash flow interest coverage and minimal financial flexibility.

"Financial viability will hinge on the successful completion of a large asset sale program, encompassing all psychiatric and international operations, as well as certain domestic acute care hospitals. Divestiture of the domestic facilities may prove to be the most challenging aspect of the program given nationwide hospital bed excess capacity."

the stock by IMA would have the direct and immediate effect of reducing the market value of the 8¼ percent debentures. Plaintiff claimed that the approval by the defendant directors would breach a fiduciary duty owed to the debenture holders. Plaintiff's request for an injunction was denied and the stock acquisition was concluded; thus, his action necessarily became one in which his sole remedy was for damages. Plaintiff, on behalf of the class, claims that, as a result of this transaction, the debentures are no longer "investment grade," but are now no better than the junk bonds issued to finance the stock purchase; yet the debenture holders have received no increase in their interest rate to compensate them for their vastly increased risk. In addition, plaintiff claims that the defendants' act of taking the corporation private and burdening it with substantial debt effectively deprived the debenture holders of their opportunity to convert their bonds to common stock.

The defendants responded to this action with a motion for summary judgment in which the foregoing facts were essentially undisputed. It is also undisputed that (1) there is no provision in the 8¼ percent debenture which prohibited such a stock purchase transaction, or the creation of future corporate debt,[8] (2) AMI was solvent when the purchase transaction was announced and remains solvent now, (3) all interest payments due to debenture holders have been made in a timely manner and there has been no breach of any of the terms of the debenture, and (4) AMI has the continued ability to continue to make the required interest payments due under the terms of the debentures.

The trial court granted this motion on July 16, 1990. In ruling on defendants' motion, the trial court applied Delaware law on the ground that the law of the state of incorporation was the proper law to apply. Under Delaware law, neither a corporation nor its directors owe any fiduciary duty to the corporation's debenture holders. (*Katz* v. *Oak Industries, Inc.* (Del.Ch. 1986) 508 A.2d 873, 879.) On July 27, 1990, plaintiff moved for reconsideration of the court's ruling, arguing that California law should have been applied. This motion was likewise denied on August 14, 1990.

This timely appeal followed.

### ISSUES PRESENTED

The critical and dispositive question which this case places before us is whether the holders of a corporation's convertible debentures, are owed any

---

[8]The record does not reflect whether the offering documents for the 8¼ percent debentures advised prospective purchasers that the indenture contract did not contain restrictions on future debt. However, as plaintiff makes no claim herein that material omissions occurred with respect to the sale of the debentures, we assume that adequate information was provided to prospective purchasers as to the terms of the indenture contract.

fiduciary duty by the corporation or its directors with respect to the management and operation of the corporation subsequent to the issuance and sale of the debentures. However, before we reach that question we have to deal with the conflict of law issue which is raised by plaintiff. We must first determine if there is any conflict between the law of Delaware and California on this issue. Only if there is do we need to address the question of which state's law properly applies.[9]

DISCUSSION

### 1. *Standard of Review*

■ Summary judgment is properly granted when the evidence in support of the moving party establishes there is no issue of material fact to be tried. (Code Civ. Proc., § 437c; *Mann* v. *Cracchiolo* (1985) 38 Cal.3d 18, 35 [210 Cal.Rptr. 762, 694 P.2d 1134]; *Johnson* v. *Berkofsky-Barret Productions, Inc.* (1989) 211 Cal.App.3d 1067, 1071 [260 Cal.Rptr. 67].) The trial court must decide if a triable issue of fact exists. If none does, and the sole remaining issue is one of law, it is the duty of the trial court to determine it. (*Taylor* v. *Fields* (1986) 178 Cal.App.3d 653, 659 [224 Cal.Rptr. 186].) This is the circumstance which we face here. The dispositive question before us is one of law: Did AMI or the director defendants owe any fiduciary duty to the corporation's debenture holders which precluded the debt financed stock acquisition of which plaintiff complains?

### 2. *There Is No Conflict Between California and Delaware Law*

Plaintiff concedes that Delaware law does not recognize the existence of any fiduciary duty by either the corporation or a director to a corporate bond holder. As the Delaware Supreme Court put it in *Katz* v. *Oak Industries, Inc.,* *supra,* 508 A.2d at page 879, "Under our law—and the law generally—the *relationship* between a corporation and the holders of its debt securities, even convertible debt securities, *is contractual in nature.* [Citations.] . . . Arrangements among a corporation, the underwriters of its debt, trustees under its indentures and sometimes ultimate investors are typically thoroughly negotiated and massively documented. The rights and obligations of the various parties are or should be spelled out in that documentation. The terms of the contractual relationship agreed to and not broad concepts such as fairness define the corporation's obligation to its bondholders." (Italics added; see also, *Anadarko Pet. Corp.* v. *Panhandle East. Corp.* (Del.Ch.

---

[9]As we point out below, we find no conflict present. The law of both California and Delaware compel the same result in this case. Thus, we have no need to reach the complex conflict issue to which the parties have devoted so much of their argument.

1987) 521 A.2d 624, 629, affd. (Del. 1988) 545 A.2d 1171; *Prudential-Bache* v. *Franz Mfg. Co.* (Del.Super.Ct. 1987) 531 A.2d 953, 955.)

Delaware limits the claims of debenture holders to a breach of the terms of the debenture, a circumstance which admittedly has not occurred in this case. Plaintiff claims that California law is contrary to that of Delaware. He argues here that California law will protect debenture holders whose interests have been harmed in the manner set forth in the complaint.

Actually, plaintiff's real argument is his notion of what California's law *should be.* Starting with the proposition that California, at least within the past 25 years, has clearly recognized that minority *shareholders* are owed a fiduciary duty by both the corporation and the majority shareholders (see, e.g., *Jones* v. *H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 111-112 [81 Cal.Rptr. 592, 460 P.2d 464]), plaintiff urges a similar rule be adopted to protect bondholder creditors. He then engages in an extensive argument which reviews the relative equities of the position of shareholders and bondholders, particularly in light of the claimed destructive impact of leveraged buyouts so prevalent in the 1980's. Plaintiff may be quite correct when he urges that existing bondholders have been the largest victims of those activities by which corporations utilized debt rather than equity financing,[10] but that does not necessarily mean that the rules should be changed in the middle of the game.

A review of the relevant decisions demonstrates that California courts have considered this issue and decided it contrary to plaintiff's views. In *Kessler* v. *General Cable Corp.* (1979) 92 Cal.App.3d 531 [155 Cal.Rptr. 94], the debenture holders complained about damage to the value of their investment when the corporation was delisted from the New York Stock Exchange after its common stock was acquired in a tender offer. The court refused to conclude that debenture holders, even those holding convertible debentures, were entitled to any special protection. "A debenture represents, primarily, evidence of debt owed by the issuer to the holder, and a corporate debenture or bond is one issued by a corporation. . . . [¶] . . . A debenture, unlike a share of stock, is evidence of corporate indebtedness, and a convertible debenture is simply a debenture convertible into stock

---

[10]Others, of course, would emphasize that the choice between debt or equity financing is simply a function, at any given moment in time, of market forces and existing government taxing policy. They would argue that bondholders have the right and opportunity to contractually control the nature and character of their investment risk. If there is a loss in the market value of the bonds as the result of the creation of new corporate debt, which event could have been anticipated in the indenture contract, the bondholders can no more be considered "victims" than any other investor in the public securities market where there has been a loss in value as the result of poor corporate performance.

under certain conditions. [¶] . . . Ordinarily, a convertible debenture is offered at a lower rate of interest than nonconvertible debentures. The investor in effect gambles that the price of the stock to which the debenture may be converted will appreciate sufficiently in value to allow profitable exercise of the conversion right at the given rate and compensate for the lesser interest received in the meantime. [¶] . . . The view remains, generally, that holders of debentures, with an option to convert, remain corporate creditors only, without any special status which affords them the opportunity to litigate in the area of potential damage to their economic interests. [Citations.]" (*Kessler, supra,* 92 Cal.App.3d at pp. 538-540.)

Similarly, in *Fox v. MGM Grand Hotels Inc.* (1982) 137 Cal.App.3d 524 [187 Cal.Rptr. 141], a debenture holder complained of a decline in market value allegedly arising from the corporation's transfer of all of its film business assets to a new corporation in exchange for all of the new corporation's stock. The court affirmed a demurrer to the complaint stating that the debenture holder would have to await an actual loss. A debenture holder's legitimate business expectations "are only that the debt, with interest, will be paid when due. [The debenture holder] has no enforceable right to have the market value of his debt unimpaired, so long as he is paid interest and principal when due." (*Fox, supra,* 137 Cal.App.3d at p. 527.)

■ It appears to us that California shares Delaware's view that a bondholder is not owed any special fiduciary duty by either the corporation or the corporation's directors. Thus, there is no conflict for us to resolve and there is no need for us to reach the conflict of law issue. (*Riley v. Fitzgerald* (1986) 178 Cal.App.3d 871, 875 [223 Cal.Rptr. 889].)

3. *A Bondholder's Rights Are Limited to the Terms of the Indenture Contract and There Is No Fiduciary Duty Owed by the Debtor Corporation or Its Directors*

Plaintiff seeks to dismiss *Kessler* and *Fox* as cases which did not involve the gross destructive impact of a leveraged buyout. He cites in support the commentary of a number of legal scholars who share the conviction that the damage done in the past 10 years to bondholders, stuck with a fixed rate and unable to protect themselves from the devasting consequences of uncontrolled leveraged buyouts, cries out for some judicial intervention.[11] This argument exposes a misunderstanding of our function. Such gross adjust-

---

[11]There can be little doubt that the value of bonds held by investors in debt securities has been severely and adversely impacted during this period. (See, e.g., Hector, *The Bondholders' Cold New World,* (Feb. 27, 1989) Fortune, at p. 83.) However, there are some who argue that the evidence supports the proposition that, on balance, "corporate takeovers generate positive

ments in the structure of the financial marketplace must be made by the state's primary policymaking body, the Legislature; it is not for the courts to undertake.

Certainly, plaintiff can cite no persuasive authorities which support his argument for such a significant change in California law. The cases relied upon by plaintiff simply do not support the conclusion which he asks us to reach. The principal California cases which plaintiff cites (*Jones* v. *H.F. Ahmanson & Co., supra*, 1 Cal.3d 93; *Pearce* v. *Superior Court* (1983) 149 Cal.App.3d 1058 [197 Cal.Rptr. 238]; *Remillard Brick Co.* v. *Remillard-Dandini Co.* (1952) 109 Cal.App.2d 405 [241 P.2d 66]) relate to the fiduciary duties of corporate directors owed to shareholders, not to creditors or bondholders.[12] In making his argument that fiduciary duties admittedly owed to shareholders should now be extended to a corporation's bondholders, plaintiff overlooks the fundamental conflict which exists between these two investing groups in the corporate family. The potential for conflict exists because bondholders have prior but fixed claims on a firm's assets, while shareholders have limited liability for the firm's debts and unlimited claims on a firm's assets. As the debt to equity ratio increases the probability and magnitude of these conflicts increase. (See Corey et al., *Are Bondholders Owed A Fiduciary Duty?* (1991) 18 Fla. St.U. L.Rev. 971, 973); McDaniel, *Bondholders and Corporate Governance* (1986) 41 Bus. Law. 413, 418.)[13] Where, as in this case, there is an increase in corporate debt to finance the

---

gains." (See, e.g., Jensen & Ruback, *The Market for Corporate Control: The Scientific Evidence* (1983) 11 J. Fin. Econ. 5.)

[12]The other cases relied upon by plaintiff equally miss the mark. None of them present the issue of the existence of a fiduciary duty on the part of a corporation's directors to so manage the affairs of the corporation as to protect either (1) the market value of outstanding debentures or (2) the debenture holder's opportunity to exercise a profitable stock option. (*Frances T.* v. *Village Green Owners Assn.* (1986) 42 Cal.3d 490 [229 Cal.Rptr. 456, 723 P.2d 573, 59 A.L.R.4th 447] [involved a personal injury action for negligence against a homeowner's association and its board of directors]; *Assn. of Haystack Property* v. *Sprague* (1985) 145 Vt. 443 [494 A.2d 122] [a case where property owners complained that improvements were not made to certain lots]; *Pepper* v. *Litton* (1939) 308 U.S. 295 [84 L.Ed. 281, 60 S.Ct. 238] [here the court made some expansive statements about the obligations of directors to protect the interests of all persons interested in the corporation's affairs, including creditors; however, it did so in the context of the corporation's bankruptcy, a circumstance admittedly not involved here]; *Pittsburgh Terminal Corp.* v. *Baltimore & O. R. Co.* (3d Cir. 1982) 680 F.2d 933, cert. denied 459 U.S. 1056 [74 L.Ed.2d 621, 103 S.Ct. 475] [involved the failure of the directors to advise debenture holders of the payment of a dividend and they missed the opportunity to convert their debentures to stock so as to receive it]; *Van Gemert* v. *Boeing Co.* (2d Cir. 1975) 520 F.2d 1373, cert. denied, 423 U.S. 947 [46 L.Ed.2d 282, 96 S.Ct. 364] [debenture holders were held to have additional rights to notice of a conversion right which was provided for in the corporation's listing agreement with the stock exchange; no such extraneous contract rights are claimed in this case].)

[13]One legal commentary explained this fundamental conflict in the following terms:

"The market value of a firm's debt is the present value of the promised payments discounted to reflect the risk that those payments will not be made. That risk is a function of

transfer of a controlling interest in the corporation's common stock, there is a significant change in the debt to equity ratio which is obviously unfavorable to bondholders. Existing shareholders have been paid in cash for their shares with money obtained from the increased corporate debt which burden, in turn, effectively threatens the financial security of the bondholders' position. Thus, we have here a maximization of the potential for conflict between the interest of shareholders and bondholders. In such circumstances, the directors would be hard pressed to discharge a fiduciary duty to both groups.

In the recent case of *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.* (S.D.N.Y. 1989) 716 F.Supp. 1504, the court had before it the exact issue presented to us. The board of directors of RJR Nabisco accepted a bid of $24 billion for a leveraged buyout of the company. This purchase was financed by approximately $19 billion in new debt. A major bondholder, Metropolitan Life, brought suit, claiming it had suffered a $40 million loss in the market value of its bonds. The court rejected all of the claims asserted by Metropolitan Life, including those based on fiduciary duty. The *Metropolitan* court found persuasive the decision of the Delaware Supreme Court in *Simons v. Cogan* (Del. 1988) 549 A.2d 300 (see fn. 14, *post*), where the court held that the mere expectancy of a convertible debenture holder cannot serve as the foundation for the creation of a fiduciary duty. "Before a fiduciary duty arises, an existing property right or equitable interest supporting such a duty must exist. The obvious example is stock ownership. Until the debenture is converted into stock the convertible debenture holder acquires no equitable interest, and remains a creditor of the corporation whose interests are protected by the contractual terms of the indenture." (*Simons, supra,* at p. 304.)

The *Metropolitan* court also considered the significance of the provisions of the written indenture agreement in disposing of the related claim of breach of the implied covenant of good faith. It emphasized that the bondholders' rights are bargained for between the parties and are expressed in the

---

the extent to which the value of the firm's assets exceeds the amount of its liabilities, which amount represents shareholder equity: debtholders are protected against declines in the value of the corporation's assets to the extent of this 'pad' of shareholder equity. Thus, wealth can be transferred from debtholders to shareholders by increasing debt or by distributing assets to shareholders—in other words, by increasing the firm's debt-to-equity ratio. For example, if new debt is issued with an equal claim on the firm's assets and the proceeds are used to retire outstanding equity, then current bondholders experience a loss of wealth. These bondholders are left with only a partial claim to the firm's assets, whereas before the new debt was issued, they had a complete claim on the assets. In this case, total assets remain the same, but the debt to equity ratio and therefore the firm's financial risk have increased. Thus, the current bondholders experience a decline in the value of the debt they hold, even though the firm's market value remains unchanged. Shareholders profit to the extent their equity, which is contingent on payment of the firm's debts, is converted to non-contingent cash payments." (Corey et al., *Are Bondholders Owed A Fiduciary Duty?, supra,* 18 Fla. St.U. L.Rev. 971, 972, fns. omitted.)

indenture contract. The prospective bondholders are free to insist upon any conditions or restrictions which they deem appropriate to protect their investment and to insure the ultimate satisfaction of the basic purpose of the transaction; that is, the periodic and regular payment of the agreed interest, together with the eventual repayment of the principal. However, if the bondholders have failed to provide protection against the impact of subsequently created corporate debt, the courts are not free to correct such omissions. "While the Court stands ready to employ an implied covenant of good faith to ensure that such bargained-for rights are performed and upheld, it will not, however, permit an implied covenant to shoehorn into an indenture additional terms [the bondholders] now wish had been included. [Citations.]" (*Metropolitan Life Ins. Co. v. RJR Nabisco, Inc., supra*, 716 F.Supp. at p. 1519.)

The law is no different in California. As the *Kessler* and *Fox* courts made clear, a bondholder, even of a *convertible* debenture, is simply a creditor of the corporation.[14] He is not entitled to any special protections which he has failed to negotiate for himself at the time of the purchase of the bond. It is not enough to argue, as does plaintiff, that the marketplace has become more dangerous. Absent fraud, or other similar misconduct, the courts have no brief to interfere in an established business relationship. If we begin here, where does it end? Would not all creditors, however minor or unsecured, be entitled to the same judicial oversight to ensure that a corporation's subsequent business conduct did not damage its credit rating or potential to ultimately make a timely discharge of the outstanding debt? This is a slippery slope which we see no need to test.[15] The issue raised by plaintiff is one which must be addressed at the time of the extension of credit and

---

[14]As the Delaware Supreme Court noted in *Simons v. Cogan, supra*, 549 A.2d 300 (where the claim of damages to convertible debenture holders, arising from an increase in corporate debt which effectively eliminated the conversion rights, was rejected), " '[T]hat a bond is convertible at the sole option of its holder into stock should no more affect its essential quality of being a bond than should the fact that cash is convertible into stock affect the nature of cash. Any bond, or any property, for that matter, is convertible into stock through the intermediate step of converting it to cash. . . . [C]ase law indicates that a convertible debenture is a bond not an equity security until conversion occurs.' *Harff v. Kerkorian* (Del.Ch. 1974) 324 A.2d [215] at 220 (quoting *In re Will of Migel*, Sup.Ct., 71 Misc.2d 640, 336 N.Y.S.2d 376, 379 (1972)) (citations omitted). In sum, a convertible debenture represents a contractual entitlement to the repayment of a debt and does not represent an equitable interest in the issuing corporation necessary for the imposition of a trust relationship with concomitant fiduciary duties. [Citation.]." (*Simons*, at p. 303.)

[15]Plaintiff's argument here that existing bondholders are entitled to protection from the courts which they failed to negotiate for themselves actually invokes a principal which has no reasonable or workable limits and could "extend equally to trade creditors, employees, and every other person to whom [the corporation is] liable in any way. Of all such parties, these informed [investors] least require a Court's equitable protection; not only are they willing participants in a largely impersonal market, but they also possess the financial sophistication

provided for in the indenture contract, not later when subsequent events may prove the error of the investor's original evaluation of the risk. A bondholder is a creditor whose remedies are necessarily limited to an action for breach of the indenture agreement. Admittedly, no such breach has occurred here, nor has one even been threatened.

In short, we share the views expressed in *Kessler, supra,* 92 Cal.App.3d 531, and *Fox, supra,* 137 Cal.App.3d 524, and believe that they not only reflect a correct statement of California law, but that no sound policy reason exists to reexamine it.

### DISPOSITION

The judgment is affirmed. Costs on appeal to the defendants.

Hinz, J., and Danielson, J.,* concurred.

---

and size to secure their own protection." (*Metropolitan Life Ins. Co.* v. *RJR Nabisco, Inc., supra,* 716 F.Supp. at p. 1525.)

*Retired Associate Justice of the Court of Appeal, Second District, sitting under assignment by the Chairperson of the Judicial Council.