[No. D000914. Fourth Dist., Div. One. Nov. 28, 1984.]

KEVIN MAROIS, Plaintiff and Appellant, v.
ROYAL INVESTIGATION AND PATROL, INC., et al.,
Defendants and Respondents.

194

**COUNSEL**

Roden & Ahler, Frank M. Thompson, Popko, Cornblum & McLean and Bruce Cornblum for Plaintiff and Appellant.

Rhoades, Hollywood & Neil and David G. Brown for Defendants and Respondents.

**OPINION**

**WIENER, Acting P. J.**—Plaintiff Kevin Marois (Marois) appeals from the judgment entered after defendants Royal Investigation and Patrol, Inc.

(Royal), James Ray Prince (Prince) and Derek Bernard Miller (Miller) successfully moved for a nonsuit. We reverse.

*Factual and Procedural Background*

Royal, a private security service, employed Prince and Miller in 1979. Their training program was essentially the skills they acquired "on the job." In June or July of that year Royal agreed to provide security for the Jack-In-The-Box on East Vista Way in Vista. That location had problems at the beginning of the summer with persons loitering and drinking beer in the parking lot.

Royal's services were to be rendered in accordance with its earlier proposal and a set of guidelines drafted by Foodmaker, Inc., the owner of Jack-In-The-Box. In its proposal, Royal represented that it wished to minimize vandalism and parking lot problems in order to maximize customer volume. The scope of the guards' responsibilities included patrolling the parking lot and effecting "citizen's arrests, if the need arises and it is absolutely necessary for the protection of property and safety of employees and customers upon the premises." Royal also stated it did "not stress physical action on the part of our guards, preferring that they attempt to handle any incidents which arise during their shifts by pre-empting a possible violent or explosive situation, before it reaches a critical stage. However, we will take whatever action is needed to protect the area, including the use of a citizen's arrest."

The Foodmaker guidelines required Royal to prevent loitering, to ask rowdy or boisterous persons to leave the premises and to "[d]etain anyone who creates damage to property or endangers lives for local law enforcement officers." If detention could not be accomplished, the security officers were to "obtain all pertinent information about the individual or incident" for law enforcement.[1]

On September 8, 1979, Prince and Miller were assigned to patrol the Jack-In-The-Box. Around 11:30 p.m. Terry Hunt entered the restaurant. His face and clothes were bloody. Prince followed Hunt into the restaurant's restroom and told him to leave the premises. Hunt immediately did so but remained in the parking lot.

---

[1]Royal's proposal and the Foodmaker guidelines are set out here as evidence of the reasonable scope of Royal's responsibilities. We do not view the parties' contract as in any sense conclusive on this issue. As we later explain, Royal's basic responsibility is to act as would a reasonable security service under similar circumstances. They are subject to liability for their failure to act reasonably. (See Civ. Code, § 1714; *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 111-112 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].)

Approximately 20 minutes later Hunt and Steve Gracelli vandalized a nearby Dean's Photo Service kiosk with a baseball bat. Dean's was located in the Jack-In-The-Box parking lot less than 25 yards from the restaurant's drive-up window. A group of persons had gathered and was watching the incident. The vandalism was witnessed by a Jack-In-The-Box employee who telephoned the sheriff's office and informed Prince and Miller he had done so. Both guards then investigated the problem.

At the time of the vandalism, Marois and his friend Bruce Stingle were waiting for their food order at the Jack-In-The-Box drive-up window. When he saw what was going on, Stingle left the car and crossed the parking lot to the area around Dean's. Marois followed shortly thereafter and found Hunt and Gracelli fighting with Stingle. Marois approached them, arming himself with an empty beer bottle. Hunt retrieved the baseball bat. Upon seeing the bat in Hunt's hand, Marois dropped the bottle and retreated. Despite the verbal attempts by Prince and Miller to dissuade him, Hunt hit Marois with the bat. The actual attack occurred just outside the drive-up window. Prince and Miller returned to the restaurant and told a Jack-In-The-Box employee to call the paramedics. They also noted the make and license plate number of the vehicle in which Hunt and Gracelli left the scene. They turned this information over to the sheriff.

Marois sued Hunt and Gracelli for assault and battery and Foodmaker, Inc., doing business as Jack-In-The-Box for negligence. Later, Marois amended his complaint to name Royal, Prince and Miller as defendants.

During trial, Marois settled with Foodmaker. After Marois rested his case, Royal, Prince and Miller successfully moved for nonsuit asserting Marois had failed to show defendants owed him a duty to act affirmatively to prevent the assault.

*Discussion*

The trial court resolved the issue in this case in terms of the defendants' duty to prevent the injury to the plaintiff. We recognize that the "duty" concept is an ingrained component of American tort law. Nonetheless, the California Supreme Court in a series of significant cases has cautioned lower courts regarding the confusing and misleading nature of "duty" analysis. "The assertion that liability must . . . be denied because defendant bears no 'duty' to plaintiff 'begs the essential question—whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. . . . [Duty] is a shorthand statement of a conclusion, rather than an aid to analysis in itself. . . . ■ [I]t should be recognized that "duty" is not sacrosanct in itself, but only an expression of the sum total of those consider-

ations of policy which lead the law to say that the particular plaintiff is entitled to protection.'" (*Dillon* v. *Legg* (1968) 68 Cal.2d 728, 734 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316], quoting Prosser, Law of Torts (3d ed. 1964) at pp. 332-333; see also *Peterson* v. *San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 805-806 [205 Cal.Rptr. 842, 685 P.2d 1193].) ■ As the court reiterated in *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 434 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166], "[L]egal duties are not discoverable facts of nature, but merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done." This court has previously noted and heeded the Supreme Court's warning. (See *Myers* v. *Quesenberry* (1983) 144 Cal.App.3d 888, 891-892 [193 Cal.Rptr. 733]; *Elam* v. *College Park Hospital* (1982) 132 Cal.App.3d 332, 338, fn. 7, 339-340 [183 Cal.Rptr. 156].)

"Duty" analysis can be confusing and confused because courts employing two separate and distinct analytic processes nonetheless label both as involving questions of the defendant's "duty." One "duty" inquiry used by some courts focuses on the reasonableness of the defendant's conduct. Where a court determines that the plaintiff was injured in spite of the defendant's reasonable actions, it is sometimes stated that the defendant's duty did not extend to the prevention of the plaintiff's injury. ■ ■■■ See, e.g., *Rogers* v. *Jones* (1976) 56 Cal.App.3d 346, 351 [128 Cal.Rptr. 404]; see also *Gomez* v. *Ticor* (1983) 145 Cal.App.3d 622, 628 [193 Cal.Rptr. 600], suggesting that a duty exists only if risk of harm is forseeable.[2])

The second "duty" inquiry involves those "considerations of policy" which on occasion lead courts to refuse to impose liability *even when* the plaintiff's injury was caused by the defendant's failure to act reasonably. (See *Dillon* v. *Legg, supra,* 68 Cal.2d at p. 734.) Thus where a defendant's nonfeasance, as opposed to misfeasance, is the basis for a claim of negligence, courts often conclude—without ever reaching the reasonableness of the omission—that the defendant had no duty to affirmatively prevent plaintiff's injury. (See, e.g., *Williams* v. *State of California* (1983) 34 Cal.3d 18, 23 [192 Cal.Rptr. 233, 664 P.2d 137]; *Thompson* v. *County of Alameda* (1980) 27 Cal.3d 741, 754 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.

---

[2]It is this type of duty analysis which causes the most confusion. Absent external policy considerations, everyone has a "duty" to act reasonably. (See *Rowland* v. *Christian, supra,* 69 Cal.2d at p. 112.) The scope of that duty is defined by the reasonable person standard. When a defendant has failed to take precautions against a risk of injury which was not reasonably forseeable, he has not acted unreasonably, i.e., he was not negligent. Thus, where forseeability of risk is the issue, the question is not whether a duty existed but rather whether an admitted duty has been breached or, more simply, whether the defendant was negligent.

4th 701].) Similarly, some courts have held that a concededly negligent lawyer or accountant owes no duty to those who were not the intended beneficiaries of his advice. (See, e.g., *Goodman* v. *Kennedy* (1976) 18 Cal.3d 335, 342-344 [134 Cal.Rptr. 375, 556 P.2d 737]; but see *Rosenblum* v. *Adler* (1983) 93 N.J. 324 [461 A.2d 138, 153].)

I

Defendants' arguments to the trial court, as well as their presentation to this court, encompass elements of both of these distinct analytic processes. ■ We choose to address the second concept first because it presents an abstract legal question of general application: Are there any established policy considerations which warrant a rule that a business establishment's security guard may never be liable to a patron of that establishment for injuries caused by the intentional tortious acts of third parties, regardless of the guard's negligence? We answer the question in the negative.

■ The general rule of negligence law in California is that a defendant is liable whenever his failure to act in a reasonable manner contributes to causing the plaintiff's injury. (See Civ. Code, § 1714; *Rowland* v. *Christian, supra,* 69 Cal.2d at pp. 112-113; *Vesely* v. *Sager* (1971) 5 Cal.3d 153, 163 [95 Cal.Rptr. 623, 486 P.2d 151].) A generally recognized exception to this general rule is that a defendant will not be held liable for his failure to control the conduct of third persons. (*Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197, 203 [185 Cal.Rptr. 252, 649 P.2d 894].) Liability may arise, however, where "the defendant stands in some special relationship to . . . the foreseeable victim of that conduct . . . ." (*Tarasoff* v. *Regents of University of California, supra,* 17 Cal.3d at p. 435.)

■ Defendants recognize that the relationship between a business and its customers is a special one requiring the business "to take affirmative action to control the wrongful acts of third persons which threaten invitees where [it] has reasonable cause to anticipate such acts and the probability of injury resulting therefrom." (*Taylor* v. *Centennial Bowl, Inc.* (1966) 65 Cal.2d 114, 121 [52 Cal.Rptr. 561, 416 P.2d 793].) But even where a business hires a security guard as a means of fulfilling its responsibility to protect its customers, defendants nonetheless contend that the security guard has no obligation to take affirmative action to protect the business's customers. We question the logic of this argument. ■ Just as a business may be liable under *Taylor* for its failure to take reasonable precautions to protect its customers (including, presumably, its failure to hire a competent security guard where there is such a need), a security guard hired by the business should be liable to an injured customer where the guard fails to act as would a reasonable security guard under similar circumstances and that

failure causes the customer's injury. ■ By contracting with the business to provide security services, the security guard creates a special relationship between himself and the business's customers. This relationship, in and of itself, is sufficient to impose on the guard the obligation to act affirmatively to protect such customers while they are on the business premises.[3] (See *Pippin* v. *Chicago Housing Authority* (1979) 78 Ill.2d 204 [399 N.E.2d 596, 599]; cf. *Dillon* v. *Wallace* (1957) 148 Cal.App.2d 447, 455-456 [306 P.2d 1044].)

## II

We believe a much closer question is presented when we leave this abstract proposition and consider its application on the facts of this case. ■ We must determine whether any jury could have concluded from the evidence presented that Prince and Miller acted in other than a reasonable and appropriate manner. Although the issue is a close one, we conclude that the evidence thus far presented is sufficient to raise a question of fact for the jury.

Marois focuses on several junctures in the sequence of events where he complains about the actions of the security guards. He argues they should not have allowed Hunt to remain in the parking lot after he appeared in the restaurant with a bloodied face, that they should have physically intervened to prevent the vandalism at Dean's and that they should at the very least have involved themselves at the point where the vandalism escalated to physical violence against him and Stingle.

We question how Prince and Miller's failure to insure that Hunt left not only the restaurant premises but also the parking lot can be deemed unreasonable.[4] To insure compliance with their directive, the guards would have had to focus on Hunt to the exclusion of their other responsibilities. In addition, Hunt's cooperative conduct following Prince's initial request gave them no reason to suspect a continuing problem.

Likewise, we find it difficult to fault Prince and Miller for failing to take affirmative action against Hunt and Gracelli at the time the vandalism first

---

[3]There is, of course, no question here that Marois was a customer of Jack-In-The-Box. He was waiting in his car at the drive-up window at the time the vandalism at Dean's began. It is also clear that the assault occurred on Jack-In-The-Box premises. The Dean's kiosk was located a short distance from the restaurant in the parking lot which was part of Prince and Miller's patrol responsibilities. Moreover, Marois was actually hit while standing next to the drive-up window.

[4]On another aspect of the negligence analysis, we also do not understand how this fact could be considered the proximate cause of Marois' injury. Given the period of time which passed between Hunt's initial trip to the Jack-In-The-Box restroom and the assault on Marois, Hunt could have easily left the parking lot and nonetheless returned to vandalize Dean's.

occurred. At that point there was no apparent risk of immediate physical injury to anyone, the sheriff's office had been called and the guards were observing the situation. The presence of additional persons watching the vandalism would have made intervention more hazardous. As a matter of law, we think a reasonable jury could not find that Prince and Miller were negligent prior to the time Stingle left Marois' car to approach the Dean's kiosk.

From that point forward, however, we believe the evidence interpreted in a manner favorable to the plaintiff raises questions of fact which at least required that defendants present their side of the story to the jury. Was it feasible, for instance, for either Prince or Miller to warn Stingle or attempt to stop him once he began to approach the melee? After Hunt and Gracelli attacked Stingle, did the risk of injury to Stingle make it reasonable for Prince and Miller to attempt to restrain the attackers? And perhaps most importantly, when Hunt retrieved the baseball bat and began to approach Marois, did the risk of serious physical harm to Marois compel the guards to do more than their mere verbal attempts to dissuade Hunt?[5] These kinds of determinations, requiring an understanding of the physical layout and close inquiry into the sequence of events, are the sort best left for the trier of fact.

Defendants also argue, however, that no "duty" is present (i.e., liability cannot be imposed) because the events leading up to Marois' injury were unforeseeable as a matter of law.[6] In particular, they point to the unsolicited intervention of Stingle and Marois to prevent the vandalism as well as Hunt's malicious attack on Marois. They rely on the proposition of law that intentional criminal acts of third persons are generally unforseeable. (See *Rogers* v. *Jones, supra,* 56 Cal.App.3d at p. 351;

---

[5]Defendants argue that affirmative intervention by the security guards in a potentially violent incident was not contemplated by either Royal or Jack-In-The-Box. While there was testimony at trial to support this assertion, we read Royal's proposal (quoted *ante* at p. 196) to clearly suggest that affirmative intervention in the form of a citizen's arrest might be appropriate under some circumstances. Both the testimony and the proposal are items of evidence to be considered by the jury in determining whether the guards acted reasonably. (See, *ante,* fn. 1.)

[6]In *Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36], the Supreme Court indicated that "foreseeability of the risk is a primary consideration in establishing the element of duty." We interpret this comment as going to the "reasonable conduct" rather than "policy considerations" prong of the duty analysis. (Compare *Richards* v. *Stanley* (1954) 43 Cal.2d 60, 66-67 [271 P.2d 23].) To say that a particular risk is not forseeable is the same as concluding that the defendant's failure to take precautions against that risk is not unreasonable, i.e., he was not negligent. (See *ante,* fn. 2.) As the court indicated in *Weirum,* there is no basis for restricting liability as a matter of law unless there is insufficient evidence from which a jury could conclude that the defendant was negligent in failing to foresee the risk of injury. (15 Cal.3d at p. 46; see also *Bigbee* v. *Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 56-58 [192 Cal.Rptr. 857, 665 P.2d 947].)

*Totten* v. *More Oakland Residential Housing, Inc.* (1976) 63 Cal.App.3d 538, 543 [134 Cal.Rptr. 29].) Marois responds that the prior incidents of loitering and rowdyism at the same location make it a question of fact as to whether the vandalism incident and the subsequent attack were forseeable. (See *Gomez* v. *Ticor, supra,* 145 Cal.App.3d at pp. 627-629.)

We view this foreseeability issue as largely a "red herring" on the facts of this case. The question here is not whether the defendant failed to appreciate the risk of third-party criminal acts and take precautions against them, as would be the case if Jack-In-The-Box were sued for failing to provide security guards at a particular location. (See, e.g., *Kwaitkowski* v. *Superior Trading Co.* (1981) 123 Cal.App.3d 324 [176 Cal.Rptr. 494] (failure to provide adequate locks); *7735 Hollywood Blvd. Venture* v. *Superior Court* (1981) 116 Cal.App.3d 901 [172 Cal.Rptr. 528] (failure to provide adequate lighting).) Rather, the issue to be determined is whether the security guards, admittedly present and charged with protecting Jack-In-The-Box customers, acted reasonably with respect to the risk which obviously confronted Kevin Marois. Where an individual is being physically assaulted, or where another individual is approached by a bat-wielding assailant, it requires no mastery of metaphysical philosophy or economic risk analysis to appreciate the strong possibility of serious injury. The only question in this case is whether the security guards responded reasonably to this clearly foreseeable risk. It was, as we have noted, inappropriate for the trial judge to remove this issue from the jury's consideration at the close of the plaintiff's case.

*Disposition*

Judgment reversed.

Butler, J., and Gamer, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.