[No. E012097. Fourth Dist., Div. Two. Aug. 3, 1993.]

SEIBERT SECURITY SERVICES, INC., Petitioner, v.
THE SUPERIOR COURT OF SAN BERNARDINO COUNTY,
Respondent;
JOHN MIGAILO et al., Real Parties in Interest.

400

---

### Counsel

Borton, Petrini & Conron and Daniel L. Ferguson for Petitioner.

No appearance for Respondent.

Shale F. Krepack, Mark, Bolson, Kuntz & Serembe and Nadine E. Betsworth for Real Parties in Interest.

---

### Opinion

**DABNEY, Acting P. J.**—Petitioner Seibert Security Services, Inc. (hereinafter Seibert), a defendant in the action below, seeks reversal of an order denying its motion for summary judgment and/or adjudication of issues. (Code Civ. Proc., § 437c.) Seibert's contention is that it established, as a matter of law, a complete defense in that plaintiff and real party in interest John Migailo's action is barred by the so-called "fireman's rule." We issued an alternative writ to inquire into the correctness of the trial court's ruling, and now conclude that petitioner is entitled to the relief sought. Accordingly, we grant the petition.

### STATEMENT OF FACTS

The essential facts of the matter are not in dispute, leaving the issue to be resolved as essentially one of law.

At the time of his injury, Migailo was a police officer employed by intervener (and real party) the City of San Bernardino. He had brought an arrested suspect to the San Bernardino County Hospital for examination of possible injuries. While he was there, a mental patient, defendant Raymond Shyptycki, became abusive towards a Black security officer employed by Seibert, Thomas Grigsby, and a Black police officer. At the time, Shyptycki was restrained in a chair; Migailo asked that he be handcuffed for greater control, but Grigsby failed to do so. Shortly thereafter, Shyptycki stood up and grabbed for Grigsby's baton, and Migailo helped subdue him.

Shyptycki was then handcuffed and put in an isolation cell, but the handcuffs were taken off because he seemed "pretty pleasant" to another Seibert employee, Timothy Leggett, who believed it was only towards Black persons that Shyptycki reacted with verbal abuse and potential violence.

Within 15 minutes, however, Shyptycki attacked Leggett, who called for help. Officer Migailo responded, and was injured while subduing Shyptycki. During the struggle between Shyptycki and Migailo, Leggett dropped back and did not assist Migailo, although another Seibert employee, Sherry Staub, did continue to participate.

The trial court denied Seibert's motion on two grounds, set forth briefly in a written order: that triable issues remained as to whether Migailo's presence was "independent and unrelated to the conduct which proximately caused plaintiff's injuries," and as to whether the conduct "proximately causing the injury occurred after the defendant . . . knew or should have known of the presence of the plaintiff, a peace officer . . . ."

## I.

### Procedural Issues

#### A.

### Timeliness of the Petition

The petition was filed on January 6, 1993. As the minute order bore the notation that copies had been mailed to counsel on November 9, 1992, we requested briefing on the issue of timeliness.[1] In response, Seibert filed declarations by counsel and counsel's secretary indicating that the notice of ruling had not been received either from the court or other counsel; it was further indicated that the court had directed plaintiff to prepare a formal order, which had similarly not been received. Although real parties attempted to cast doubt on these assertions by confirming mailing of notice and a copy of the formal ruling on December 7 (as to which the petition would also have been untimely), we deem it appropriate to resolve the conflict in favor of petitioner. It is true that adequate proof of mailing is presumptive evidence of receipt under Evidence Code section 641. However, not only did the declarations provide substantial direct evidence of non-receipt, but such evidence is also circumstantial evidence that notice was *not* mailed as claimed. (*Jenson* v. *Traders & General Insurance Company* (1956) 141 Cal.App.2d 162, 164 [296 P.2d 434].) While we are cognizant of the policies favoring prompt review of orders made under section 437c (see e.g. *Schmidt* v. *Superior Court, ante* at fn. 1), no party is prejudiced by our review, and we therefore proceed on the basis that real parties have failed to

---

[1]Code of Civil Procedure section 437c, subdivision (*l*), requires that a petition for extraordinary review of an order denying summary judgment be filed with the appellate court within 20 days after the aggrieved party is served with written notice of entry of the order, subject to a 10-day extension which may be granted by the trial court. The time limits are jurisdictional. (*Schmidt* v. *Superior Court* (1989) 207 Cal.App.3d 56, 61 [254 Cal.Rptr. 827].)

positively establish that the petition is untimely. (See *City of Sunnyvale* v. *Superior Court* (1988) 203 Cal.App.3d 839, 846-847 [250 Cal.Rptr. 214].)

## B.

### *Other Procedural Matters*

We may also dispose of other minor procedural issues. ■ The city argues that the factual issues presented for summary adjudication, as an alternative to summary judgment, were "compound," or "far too broad and sweeping." Insofar as the city appears to argue that a party may not ask the court to decide complex or dispositive issues, it is simply wrong. Insofar as it asserts that the issues presented involved *disputed* factual matters, we agree that a court cannot grant such a motion if a dispute is shown, but if the material facts are clear the application of legal principles to resolve the case is proper.[2] (*Pittleman* v. *Pearce* (1992) 6 Cal.App.4th 1436, 1441 [8 Cal.Rptr.2d 359].) ■ While we note on our own initiative that the issues may not all be framed in compliance with Code of Civil Procedure section 437c, subdivision (f), any defects become moot because we have determined that summary judgment must be ordered *in toto*.

Moot also is petitioner's objection that the court's order failed to specify the evidence demonstrating issues of fact, as required by Code of Civil Procedure section 437c, subdivision (g). (See *Globe Immunity Co.* v. *Superior Court* (1992) 6 Cal.App.4th 725, 728 at fn. 1 [8 Cal.Rptr.2d 251]: "Because we have decided the issues as a matter of law, remanding this matter for compliance with section 437c would serve no useful purpose.")

### DISCUSSION

## II.

### *The "Fireman's Rule"*[3]

The "fireman's rule" "was born almost a century ago, earning nearly unanimous acceptance." (*Walters* v. *Sloan* (1977) 20 Cal.3d 199, 202 [142

---

[2]It hardly needs saying that the existence of a dispute concerning an *immaterial* fact does not deprive the court of the power to grant summary judgment. (See *Hidalgo* v. *Anderson* (1978) 84 Cal.App.3d 378, 381 [148 Cal.Rptr. 557], citing the language of the statute itself.) In this category are such "disputed facts" as whether or not Seibert's negligent training practices may have contributed to the injury.

[3]We recognize that the Legislature, in Civil Code section 1714.9, employs the gender-neutral term "firefighter" and that some recent cases adopt the term "firefighter's rule" in place of "fireman's rule." (See, e.g., *Knight* v. *Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 834, 834 P.2d 696], as noted in the concurring opinion.) At the risk of being thought deficient in sensitivity, we adhere to the traditional usage in part to render our opinion more readily

Cal.Rptr. 152, 571 P.2d 609].) ■■■■■ Although recognizing that "[i]n recent years, the rule has been repeatedly attacked," the *Walters* court solidly reaffirmed its continuing viability in this jurisdiction.[4, 5] ■ The rule applies equally to police officers injured in the course of their duties.[6] (*Ibid.*; *City of Redlands* v. *Sorensen* (1985) 176 Cal.App.3d 202, 207 [221 Cal.Rptr. 728].)

---

accessible to electronic researchers not enlightened enough to program "firefighter's rule" into their search requests, and in part because the term "fireman's rule" has historic roots and remains widely used. (See *Gibb* v. *Stetson, infra; Davis* v. *Gaschler* (1992) 11 Cal.App.4th 1392 [14 Cal.Rptr.2d 679].) In this context we note our express disagreement with the approach taken in *Terhell* v. *American Commonwealth Associates* (1985) 172 Cal.App.3d 434 [218 Cal.Rptr. 256], in which the court rewrote actual quotations by inserting the visually awkward "fire[fighter]'s" in place of "fireman's."

With all due respect to our dissenting colleague, we do not agree that this use of the term is "regressive"; we have adopted the neutral "firefighter" and "police officer" in the text of this opinion. However, we do not feel obliged to abandon a traditional term under the tyranny of political correctness. We look forward to the day when society's acceptance of persons of both sexes in all occupations makes technically gender-specific terminology moot.

[4]We believe that the fireman's rule survives the limitations on the defense of reasonable implied assumption of the risk established in *Knight* v. *Jewett, supra*, 3 Cal.4th 296. Although the fireman's rule is grounded on the theory of assumption of the risk (see *Walters* v. *Sloan, supra*, 20 Cal.3d at pp. 203-204), it appears to fall within the category defined in *Knight* as comprising those instances in which the defendant's acts breach no duty owed to the plaintiff, and the court so suggests in dictum. (3 Cal.4th at p. 315; at pp. 309-310, fn. 5.) A recent case follows the indication in *Knight*. (*Donohue* v. *San Francisco Housing Authority* (1993) 16 Cal.App.4th 658 [20 Cal.Rptr.2d 148].)

It is true that in some cases it might be argued that a defendant breaches a duty of care owed generally to the public if he negligently commits acts which result in a dangerous fire or encourage the commission of a crime. However, to hold that in such a case the fireman's rule does not bar recovery would be to create inequitable distinctions, allowing recovery in one case but not in another, although the hazard encountered might be identical. We also observe that Civil Code section 1714.9, which creates statutory exceptions to the fireman's rule based largely upon conduct occuring after the defendant has knowledge of the presence of the protected officer, allows a reduction in damages based upon the comparative negligence of the peace officer, firefighter, or emergency medical person. Thus, it anticipates *Knight* in the sense that liability subject to reduction is imposed where the defendant, due to his knowledge of the officer's presence, owes him a direct duty of care; however, it provides a basis for holding that *Knight* does not apply to routine fireman's rule cases because such cases are not subject to the recognition of the applicability of comparative negligence which is contained in the statute.

Finally, we believe that the policy bases of *Walters*, as discussed below, simply forbid the imposition of tort liability on the average citizen who is compelled, for whatever reason, to call on the police or fire personnel. Insofar as the legislature has created specific narrow exceptions to this rule, this action confirms our general position.

[5]State courts which have recently considered the fireman's rule for the first time appear to have consistently adopted it. (See, e.g., *Winn* v. *Frasher* (1989) 116 Idaho 500 [777 P.2d 722, 733].)

[6]We will sometimes refer only to police officers in discussing the effects of the rule, as a police officer is involved in the case before us and the constant repetition of "firefighter or police officer" is stylistically tedious.

The classic formulation of the rule holds that "negligence in causing a fire furnishes no basis for liability to a professional fireman injured fighting the fire. Firemen, 'whose occupation by its very nature exposes them to particular risks of harm, " 'cannot complain of negligence in the creation of the very occasion for [their] engagement.' " ' " (*Walters* v. *Sloan, supra,* 20 Cal.3d at p. 202.)

 Although originally often framed with reference to a landowner's premises liability, the rule is fundamentally based on public policy and the nature of the relationship between the firefighter or police officer and the public. (*Walters* v. *Sloan, supra,* 20 Cal.3d at pp. 202-203; see also *Flowers* v. *Rock Creek Terrace* (1987) 308 Md. 432 [520 A.2d 361, 367-368].) The rule is designed with the recognition that most fires (and perhaps most crimes) are due at least in part to negligence, "and in the final analysis the policy decision is that it would be too burdensome to charge all who carelessly cause or fail to prevent fires with the injuries suffered by the expert retained with public funds to deal with those inevitable, although negligently created, occurences." (*Krauth* v. *Geller* (1960) 31 N.J. 270 [157 A.2d 129, 130-31], quoted in *Walters, supra,* 20 Cal.3d at p. 205.) The undesirable consequences of a contrary rule have also been noted; the freedom from liability provided by the fireman's rule " 'permits individuals who require police or fire department assistance to summon aid without pausing to consider whether they will be held liable for consequences which, in most cases, are beyond their control.' " (*Rishel* v. *Eastern Arlines, Inc.* (Fla.Dist.Ct.App. 1985) 466 So.2d 1136, 1138, quoted in *Fisher* v. *Farrell* (Fla.Dist.Ct.App. 1991) 578 So.2d 407, 408-409.)

Finally, as also recognized and relied upon in *Walters* v. *Sloan, supra,* 20 Cal.3d 199, police officers and firefighters receive not only salaries calculated with considerations of the risks faced, but also special disability, retirement, and other benefits. (20 Cal.3d at p. 205.)

 ██ However, salutary as the rule is recognized to be, it is subject to a number of exceptions, at least some of which are contained in Civil Code section 1714.9.[7] That statute abrogates the fireman's rule if "the conduct causing the injury occurs after the person knows or should have known of the presence of the peace officer, firefighter, or emergency medical personnel." (Subd. (a)(1).) Real parties rely upon this statute, as did the trial court.

---

[7]At least one case *Terhell* v. *American Commonwealth Associates* (1985) 172 Cal.App.3d 434, 442 [218 Cal.Rptr. 256]) appears to take the view that Civil Code section 1714.9 and its partial predecessor, Labor Code section 3852, do not purport to set out an exclusive list of exceptions. We make the same assumption, in part because the statutes were enacted in direct response to a Supreme Court decision refusing to recognize a particular claimed exception,

■ The second express basis for the trial court's ruling was that Migailo's presence was unrelated to the negligence which caused his injury. This exception has been applied, for example, when a police officer, pursuing a suspect, is injured due to a dangerous condition on real property. (See *Kocan* v. *Guarino* (1980) 107 Cal.App.3d 291, 296 [165 Cal.Rptr. 712], in which the officer was injured when a fence collapsed.) In the same vein is the case of a firefighter who, while fighting a fire, falls through a defectively maintained roof. (See *Bartholomew* v. *Klinger* (1975) 53 Cal.App.3d 975, 978 [126 Cal.Rptr. 191].) The rationale of these cases is that, as to the suffering of such injuries, the firefighter or police officer stands in the same posture as any citizen venturing onto the land of another; his occupation compels him to face felons or fires, not rickety roofs or faulty fences.

Real party the City of San Bernardino additionally raises a many-pronged but single-pointed argument to the effect that Seibert owed a special duty to plaintiff Migailo, which also negates the effect of the fireman's rule. As we find that no such duty was owed or breached, we need not determine whether, or to what extent, the existence of a "special relationship" between a defendant and a plaintiff might estop the defendant from relying on the fireman's rule.

A.

*The Statutory Exception Inapplicable*

Civil Code section 1714.9 expresses the legislative view that, even if a firefighter or police officer accepts the general risks of his employment, and that the costs of those risks are properly spread throughout the community, in some circumstances egregious conduct on the part of a defendant may give rise to tort liability. The subdivision under consideration was prompted by the decision in *Hubbard* v. *Boelt* (1980) 28 Cal.3d 480 [169 Cal.Rptr. 706, 620 P.2d 156], in which the court rejected a policeman's suit based on the negligent conduct of a fleeing suspect, as a result of whose negligence the officer was involved in an automobile accident during the pursuit. (See *City of Redlands* v. *Sorensen, supra,* 176 Cal.App.3d at pp. 208-209, on the statutes as a reaction to *Hubbard.*)

The law now warns any person causing an incident which results in the summoning of a police officer, firefighter, or emergency medical care

and there is no basis for an inference that the Legislature was dissatisfied with existing, judicially created exceptions.

provider—or any person who is present when such a person arrives to render services—that tort liability may be imposed for wrongful acts committed in the knowledge that the person covered by the statute is present. Thus, in the *Hubbard* situation, the fleeing suspect would be liable for his negligence in leading the officer into a dangerous pursuit. Similarly, a suspect or prisoner who resists a recognized officer (or any officer the suspect *should* recognize as an officer) is liable for any injury caused by his resistance; this was the situation in *Gibb* v. *Stetson* (1988) 199 Cal.App.3d 1008, 1014-1015 [245 Cal.Rptr. 283], in which an officer attempting to take a defendant into custody was injured when the defendant unexpectedly slumped to the floor.[8]

■ Read literally, the statute appears to except the situation represented here from the operation of the fireman's rule. It is not disputed that Seibert personnel were aware of Migailo's presence (apparently at least one other officer, a Black officer, was also in the area at the time Shyptycki first became abusive towards Blacks). However, in our view such a construction leads to absurd results and is contrary to any reasonable policy of the law. ■ In construing a statute, we are cautioned to avoid absurd results (*In re Eric J.* (1979) 25 Cal.3d 522, 537 [159 Cal.Rptr. 317, 601 P.2d 549]), and we find it easy to do so here.

■ ■ ■ ■ ■ Under the fireman's rule, for the sound policy reasons which we have listed above, a person's negligence cannot be used to impose tort liability if the officer or firefighter is injured in remedying the condition negligently caused. However, under the construction urged by real parties, every person would be under a new, special duty of care whenever the police officer or firefighter is "present" and the person knew or should have known of the presence. While such an exception can reasonably be applied to *new* conduct committed by such person after the officer has been summoned in the course of his duties[9] (see e.g. *Gibb* v. *Stetson, supra,* 199 Cal.App.3d 1008; *City of Redlands* v. *Sorensen, supra,* 176 Cal.App.3d 202), it *cannot* be reasonably applied to conduct occurring while the officer is

---

[8]Thus, Shyptycki would be liable for any injury to Migailo, if he had an awareness, despite his mental aberrations, that Migailo was a police officer.

[9]In speaking of a police officer's performance of his "duty" to apprehend criminals and keep the peace, we remain cognizant of the fact, which we discuss below, that a police officer does not have any *legal* duty to stop a particular crime or catch a particular suspect. (See *Williams* v. *State of California* (1983) 34 Cal.3d 18, 24, fn. 3 [192 Cal.Rptr. 233, 664 P.2d 137].) Thus, an officer who stands by while a crime is committed is not liable in tort to the victim. (*Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197, 203 [185 Cal.Rptr. 252, 649 P.2d 894].) The police officer's duty to which we refer is the duty created, in a more general sense, by his acceptance of employment and his implied or express representation to his employer that he will carry out the usual tasks of a police officer.

"present" but *before he has undertaken his duties of protection or crime prevention.*

A few examples will make the point clear. A person, standing on a city street corner, observes a police officer on foot patrol a few yards away. Feeling safe due to the officer's "presence," the person allows a valuable camera to hang loosely from his arm, and a passing thief is thereby encouraged to grab at the camera. The officer observes this conduct, responds, confronts the thief, and is injured in a struggle. The victim was no doubt foolish—"negligent," in the eyes of the law—to relax his vigilance and invite crime, but is he therefore liable in tort to the officer?

A driver on a mountain road idly observes a fire truck (obviously containing firefighters, but not proceeding to a call) on the road immediately behind him. The driver carelessly flicks a lighted cigarette butt out the window, causing a brush fire. The fire truck immediately stops and the firefighters fight the fire; one is injured. Is the driver liable?

Finally—and we recognize that we are pressing the limits of the absurd—an overweight man at a doughnut shop notices emergency medical personnel drinking coffee at a table next to him. Ignoring his doctor's advice, he consumes three jelly doughnuts, and collapses from a heart attack. A member of the emergency team trips over a chair rushing to his aid, and is injured. Is the glutton liable?

In each of these hypothetical cases, the defendant was aware that a member of the protected class was present, and nevertheless committed negligent conduct which raised some risk that intervention would be necessary. Strictly speaking, Civil Code section 1714.9, subdivision (a)(1) applies. However, this approach is fraught with inequities.

It is inequitable as to the defendants, because the same conduct, committed with the same likelihood that *some* police officer, firefighter, or emergency medical aid person would have to be summoned, would be immune from liability if no specific member of the protected class was present, or even if such a person was present, but was not reasonably known to be so (e.g., a plainclothes police officer). As long as conduct is merely negligent, and not wilful or malicious, there is no point in imposing liability on the defendant whose acts are likely to involve a specific police officer, while precluding liability on the defendant whose negligent acts require the summoning of an officer at random.

It is equally inequitable as to the plaintiffs, by awarding tort recovery to the officer who happens to be at the scene when a negligently caused incident occurs, but barring recovery for the officer who responds to a radio call. We find such distinctions untenable and inconsistent with the long-established purpose of the fireman's rule. In our view, the statute applies only to conduct committed after the officer responds to a call for assistance, or while he is in the performance of his duties with respect to a specific incident, and such conduct increases the risk of injury to the officer. It does not require citizens to be especially vigilant or careful whenever they happen to observe the near presence of a member of the class covered by the statute.

Accordingly, we hold that the trial court erred in relying upon Civil Code section 1714.9 in determining that a triable issue of material fact existed. Migailo did not suffer any injury during Shyptycki's first outburst; he returned to his paperwork. Later, Seibert employees removed the handcuffs from Shyptycki, which was allegedly, and arguably, negligent. At this point, Migailo was still "present," at least in the vicinity, and was known by the Seibert employees to be a police officer, but he was not performing any police duty with respect to Shyptycki. For the purposes of the fireman's rule, Migailo might as well have been 20 blocks away rather than 20 feet.

When Shyptycki again became violent, Migailo responded in accordance with his duty as a police officer. At this point, Migailo was "present," and Seibert's employees *were* under a duty not to contribute to his peril by negligent conduct. However, no such additional conduct occurred.[10] This exception to the fireman's rule does not apply.

B.

*Misconduct Unrelated to the Officer's Presence*

The second basis for the trial court's ruling is that a triable issue of material fact exists as to whether Seibert's employees committed an independent or unrelated act of negligence. By a similar analysis, we find as a matter of law that no such act occurred.

Real parties' reliance upon *Rose* v. *City of Los Angeles* (1984) 159 Cal.App.3d 883 [206 Cal.Rptr. 49], is misplaced. In that case, plaintiff Rose, a reserve police officer, was shot by a fellow officer during the service of a

---

[10]We discuss below the city's contention with respect to the assistance actually provided, and the decision by one Seibert employee to withdraw.

search warrant. (Apparently the other officer did not recognize Rose as a police officer.) In a decision which may be debatable, the court held that the fellow officer's negligence was "completely independent" of the reason for Rose's presence on the scene—i.e., the illegal conduct of the narcotics suspect. (159 Cal.App.3d at p. 889.)

Even if we accept that the risk of error and confusion during the service of a warrant is not inherent in a policeman's job, *Rose* v. *City of Los Angeles, supra,* 159 Cal.App.3d 883 is readily distinguishable. In that case, plaintiff Rose was carrying out a specific law enforcement duty—assisting in serving a warrant—when the negligence of his fellow officer unacceptably increased the risk *inherent in that duty* and caused injury. Here, Migailo was performing one duty—completing paperwork relating to the injured suspect—when the alleged negligence of Seibert employees caused him to initiate a new and different law enforcement action and attempt to subdue Shyptycki. While the conduct of Seibert employees may have been "independent of and unrelated to" the conduct which originally brought plaintiff to the hospital, it is factually undisputed that it was the *immediate cause* of Migailo's presence in or near the holding cell in which Shyptycki was tussling with Seibert employee Leggett.

Once again, we conclude that any other result would be absurd. Following the examples given above, it can readily be seen that the careless pedestrian's slackening of his grip on his valuables would constitute an act "unrelated" to the circumstances which brought the police officer to the same corner. Similarly, the careless smoker's act is "unrelated" to whatever reasons caused the firefighters to be immediately behind him on the road. However, the fortuitous presence of such personnel cannot mean that any negligent conduct which creates a crisis to which such personnel react becomes actionable in tort; the same indefensible distinctions and inequities would result as we raised above. Unless the police officer or firefighter has come to a specific location to perform a specific immediate duty, and the defendant's unrelated negligent or intentional conduct increases the risks inherent in performing that duty (see, e.g., *Kocan* v. *Guarino, supra,* 107 Cal.App.3d 291; *Bartholomew* v. *Klinger, supra,* 53 Cal.App.3d 975), this exception is similarly inapplicable.

C.

*The Effect of Seibert's Contractual Duty to Provide Security Services*

Finally, we turn to the argument pressed primarily by the City of San Bernardino—that Seibert employees cannot claim the

benefit of the fireman's rule because their acts breached a duty owed directly to Migailo, which supersedes and cancels the fireman's rule. We find this contention more difficult to resolve, but conclude that because as a matter of law there was no such duty, it too is without merit.[11]

As we have discussed above, the fireman's rule generally prevents a police officer from recovering in tort from a person whose negligence has caused a dangerous situation to which the officer responds. A rule of broader applicability is that no person owes a duty to another to rescue or assist another, if the first person has not created the peril in which the latter is placed. (*Zepeda* v. *City of Los Angeles* (1990) 223 Cal.App.3d 232, 235 [272 Cal.Rptr. 635].) A third, related rule of general import is that no person owes a duty to control another person, which duty would run to the benefit of third parties. Although it sometimes leads to distressing results, the same rules apply even to police officers who fail to prevent crime or assist victims. (See *Williams* v. *State of California*, 34 Cal.3d 18 [192 Cal.Rptr. 233, 664 P.2d 137], and *Davidson* v. *City of Westminster, supra*, 32 Cal.3d 197, cited in fn. 9, *ante.*)

One exception to the rule concerning control of third parties applies where the victim and the person who fails to act stand in a "special relationship," or where the nonactor stands in such a relationship to the actual tortfeasor. (*Davidson, supra*, 32 Cal.3d at p. 203; *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 435 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166].) Such a "special relationship" exists between a business establishment and customers or invitees; the establishment is under an affirmative duty to take reasonable precautions to protect its patrons from criminal conduct by third parties. (*Lopez* v. *McDonald's* (1987) 193 Cal.App.3d 495, 504 [238 Cal.Rptr. 436]; see also *Isaacs* v. *Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 123-124 [211 Cal.Rptr. 356, 695 P.2d 653, A.L.R.4th 1747].)

 In *Marois* v. *Royal Investigation & Patrol, Inc., supra*, 162 Cal.App.3d at pages 199-200, the court held that a private security service under contract to carry out the *landowner's* duty to business invitees thereby

---

[11]We disregard the documents submitted in connection with the City of San Bernardino's supplemental answer, consisting of purported copies of contracts between Seibert and the county which set forth Seibert's duties and obligations under the contracts. These documents were not presented to the trial court and we decline to consider them.

We also note that Seibert's contractual duties are not conclusive as to the extent of any legal duty of care it owed to third parties; such duty would be measured by legal standards of reasonableness. (*Marois* v. *Royal Investigation & Patrol, Inc.* (1984) 162 Cal.App.3d 193, 196 at fn. 1 [208 Cal.Rptr. 384].)

enters into a "special relationship" with such invitees, more or less as a proxy. The city relies on *Marois* to support its argument that Seibert owed a specific duty to visitors to the hospital, such as plaintiff Migailo, which it breached by its negligent supervision of Shyptycki.

We accept that visitors to a medical facility are entitled to the protections of this "special relationship." (See *Isaacs* v. *Huntington Memorial Hospital, supra*, 38 Cal.3d 112.) Thus, we agree that, subject to the effect of facts not established on this record, Seibert and its employees presumably owed a duty of care to Migailo to prevent assaults by disturbed patients. However, that is not what occurred here.

If Migailo had been preoccupied with completing paperwork at a hospital counter when Shyptycki, negligently allowed to escape by Seibert employees, rushed upon him from behind and struck him on the head, we might agree that Seibert would be liable. In such a situation, Migailo would be similarly situated to any user of the property, and quite arguably entitled to rely upon Seibert's performance of the duty of care owed by the landowner. Such a case would be analytically very similar to that of the officer or firefighter who, while pursuing a thief or fighting a fire, is injured due to an unrelated dangerous condition on the property. (See *Kocan* v. *Guarino, supra*, 107 Cal.App.3d 291, *Bartholomew* v. *Klinger, supra*, 53 Cal.App.3d 975.)

But this case is significantly different. Seibert's employees, perhaps negligently, failed to restrain Shyptycki adequately, and as a result of this possible negligence he was able to violently assault Timothy Leggett. As a police officer, Migailo responded to the disturbance, presumably both to assist Leggett and to prevent Shyptycki's escape. At this point, Migailo was no longer the business invitee or visitor to whom the landowner owed a duty which had been delegated to Seibert; he was a police officer acting on behalf of the public, attempting to subdue a dangerously disturbed person. Thus, at the moment of his injury, plaintiff was no longer relying—or entitled to rely—upon the landowner's duty to protect him; instead, he was carrying out his own duty to protect the public.

The duty of a security service employed to carry out the landowner's duty of care to visitors is no greater than that of the landowner itself. (*Balard* v. *Bassman Event Security, Inc.* (1989) 210 Cal.App.3d 243, 247 [258 Cal.Rptr. 343].) There is authority to the effect that, as a matter of policy, no tort liability attaches to a landowner or operator of a business, if a customer responds to an employee's urgent request for help in rebuffing

a criminal attempt or apprehending the perpetrator. (*Forrand* v. *Foodmaker* (1986) 182 Cal.App.3d 196, 200 [227 Cal.Rptr. 74].)[12] Still less justification exists for imposing tort liability on the victim of a criminal assault—here, Seibert's employee Timothy Leggett—who calls on a nearby police officer for aid. The fact that it might have been Leggett's negligence, or that of his fellow Seibert employees, which caused the crisis, is irrelevant under the fireman's rule, as we have held above.

We do not quarrel with the proposition, under *Marois* v. *Royal Investigation & Patrol, Inc., supra,* 162 Cal.App.3d 193, that Seibert and its employees had a duty to protect visitors from foreseeable criminal assaults— nor that Shyptycki represented a clear danger to visitors. However, when Migailo became a police officer, he implicitly waived any duty of care owed to him by anyone, insofar as a breach of any such duty created a situation to which Migailo, as a police officer, had an obligation to respond. Migailo was entitled to expect Seibert employees to protect him from positive aggression, but when he reacted in his capacity as a police officer and deliberately encountered the danger represented by Shyptycki, he became subject to the greater social policy denying him a recovery in tort against those who caused the danger. (See *Woods* v. *City of Warren* (1992) 439 Mich. 186 [482 N.W.2d 696, 699], holding that a public entity's affirmative duty to maintain safe streets does not permit avoidance of the fireman's rule where a police officer, pursuing a suspect, is injured in an accident caused by icy roads.)

If Seibert employees had been aware that any injury to Migailo could lead to tort liability, it is possible that they might have been reluctant to call on him. Clearly, it is not in the public interest to discourage persons needing police assistance from calling for it. (See the quoted portion of *Fisher* v. *Farrell, supra,* 578 So.2d 407, at p. 406, *ante.*) It would place any security service—or any employee of a business enterprise which owes a duty to the public to prevent assaults on patrons—in a cruel quandary to say that if a police officer who is fortuitously on the premises is summoned for assistance, he can sue for his injuries; if he is *not* summoned and other patrons are

---

[12]This court reached a different conclusion on similar facts, based in part upon our analysis of the "duty" factor largely left undecided in *Forrand*. The Supreme Court has granted review in that case. (*Robbins* v. *Southland Corp.* (Cal.App.) review granted Jan. 28, 1993 [S030177].) The eventual resolution of the issue does not affect our decision here.

The *Forrand* court focussed upon foreseeability, holding that a store clerk could not reasonably have foreseen the customer's extended pursuit of the criminal when she cried "Stop him!" In this case, Leggett's cries for help were probably intended to bring someone into close proximity with the violent Shyptycki, and injury to someone was certainly foreseeable. We find in this case, however, that a victim owes no duty to a police officer *not* to summon him for assistance.

injured, similar liability ensues. As we stressed above, the officer's chance presence on the premises, on an unrelated errand, cannot be held to accomplish such a drastic shift in duties and liabilities.[13]

## D.

### *Related Contentions*

These conclusions permit us to dispose speedily of the city's numerous other related, and interrelated, contentions. ■ The city argues that a jury should be permitted to determine whether Seibert committed "unrelated" or "independent" acts of negligence with respect to its hiring practices, training methods, and staffing decisions. However, any negligence in these areas was merely a factor in creating the basic risk. In a similar case, the Court of Appeals of the District of Columbia rejected an effort by a firefighter to recover due to the defendant's allegedly negligent hiring of an employee whose negligence compelled the firefighter's response, holding that the causative factors could not be separated. (*Young v. Sherwin-Williams Co., Inc.* (D.C. App. 1990) 569 A.2d 1173, 1179.) We agree that the fireman's rule cannot be subverted by the artificial isolation of specific factors, and find here that all of Seibert's allegedly negligent acts were inextricably involved in causing the danger of an unrestrained outburst by Shyptycki. Thus, no issue remained for submission to the jury.

■ Similarly, we reject the contention that the jury should have been allowed to determine what conduct brought Migailo to the scene within the meaning of Civil Code section 1714.9. Under our analysis above, his presence *at the immediate scene of the final altercation* is the critical issue, and as the cause for that presence is undisputed (he responded to the shouts of Seibert employees), no factual issue remains.

■ The city argues that because one Seibert employee apparently assisted in restraining Shyptycki, while another backed away from the struggle, some liability may be imposed. We see no legal basis for the contention. It is not argued that the Seibert employee who assisted Migailo did so in such an inept manner that Migailo was injured *as a result* of the counterproductive assistance (e.g., if the employee had accidentally seized Migailo's arm and prevented him from defending himself), and we do not

---

[13]It may also be repeated that Migailo took affirmative steps to encounter Shyptycki on the last occasion. Although he may have done so at the request of Seibert employees, that happenstance should be irrelevant; he was under an employment duty to respond to the disturbance.

decide that case; rather, the city implies that Seibert undertook a new, affirmative duty to see that Shyptycki *was* subdued. For the reasons given above, however, we hold that a police officer injured in the course of attempting to apprehend or subdue a suspect or dangerous person cannot sue a person who chooses to render him assistance *which is not legally required*, merely because that assistance proves inadequate to prevent injury. ■■ ■ A police officer has no right to expect private assistance, and he cannot complain if any such assistance is not good enough.[14] In this context we return to Civil Code section 1714.9, which creates an exception to the fireman's rule for conduct which *causes* injury; in our view, neither pure nonfeasance nor ineffective assistance efforts falls into this category.[15]

### DISPOSITION

Let a peremptory writ of mandate issue, directing the superior court to vacate its order denying petitioner's motion for summary judgment, and to enter a new order granting said motion.

McKinster, J., concurred.

**TIMLIN, J.**—I concur in the majority's analysis and in the disposition, but feel compelled to comment on two aspects of the majority opinion with which I disagree.

1. *Use of the Term "Fireman's Rule"*

Footnote 3 attempts to justify the continued use of the gender specific word "fireman" in the descriptive title "fireman's rule." (Maj. opn., *ante*, p.

---

[14]Government Code section 13970, which provides for indemnification for private citizens who are injured while attempting to prevent crime, apprehend criminals, or assist in the case of catastrophic emergencies, clearly reflects the public policy of encouraging such involvement—a policy that would be eviscerated if such citizens were routinely liable to suit.

Government Code section 13971 excepts public safety officers, and "others whose employment includes the duty to protect the public safety . . . ." Although it could be argued that this excludes private security guards, we think the basic policy deserves respect—and we have noted above that the security guard's duty is no more than that of his employer, which is owed *not* to the public at large, but to business invitees.

[15]One of Timothy Leggett's supervisors testified that his behavior in backing off from the struggle after others pulled Shyptycki away from him was not what she would have expected. However, any breach of duty was between Leggett and his employer. It simply cannot be argued that Leggett, as a victim, owed an affirmative duty to Migailo to rejoin the fray. Nor can the efforts of the remaining Seibert employee be construed as an affirmative acceptance of a specific duty to Migailo on behalf of the company; as we discussed above, the police officer's primary duty to the public prevents him from relying on any such duty owed to him.

404.) I respectfully disagree with the continuation of such gender-specific language. In this age of avoiding sexual stereotyping in language, the use of that label is regressive. Consistent with this view are recent opinions—one from the California Supreme Court and two from intermediate appellate courts—which, in their discussion of the rule, use the term "firefighter." (See *Knight* v. *Jewett* (1992) 3 Cal.4th 296, 309, 310, fn. 5 [11 Cal.Rptr.2d 2, 834 P.2d 696]; *Donohue* v. *San Francisco Housing Authority* (1993) 16 Cal.App.4th 658 [20 Cal.Rptr.2d 148]; *Hacker* v. *City of Glendale*\* (Cal.App.).) Further, as the majority recognizes, the Legislature also uses the gender-neutral term "firefighter" in Civil Code section 1714.9.

In my view, the majority's two rationales for continuing to use the term "fireman" simply make no sense. I address each of these rationales in turn.

First, as to the problems of "unenlightened" electronic researchers: As noted above, the term "firefighter's rule" is now often used in place of the term "fireman's rule." Thus, any researcher worth his or her salt should already be searching using *both* terms, or using an electronic search term such as "fire! pre/1 rule."

Second, as to the majority's feeling that it is not obliged to "abandon a traditional term under the tyranny of political correctness": The majority, without any indication of having given any thought to the substance behind the use of the phrase, "politically correct," has simply tossed out this catchphrase in the apparent hope of appearing firm and principled by resisting any negative connotations conjured up by its use. But the amorphousness of "political correctness" causes its meaning to shift depending upon who is using it and the context within which it is used, and, in any event, it is merely a way of denominating what its user thinks is acceptable in a particular political climate. In other words, it is a phrase of opinion, not definition.

It seems to me that the real issue here is *not* whether one opines that the term "firefighter" is currently acceptable, given the existing political and social climate, but rather, what *purpose* one believes is served by choosing to use that term rather than the term "fireman." *This* issue, the *real* issue, is never actually addressed by the majority, although some allusion is made to it in the majority's statement that "We look forward to the day when society's acceptance of persons of both sexes in all occupations makes technically gender-specific terminology moot." (Maj. opn., *ante*, p. 405.)

In making this last-noted comment, the majority finally touches upon the real issue presented by this disagreement over language—what *is* the purpose of using one word rather than another? In my opinion, the purpose of using non-gender-specific language is to accurately acknowledge that the activity being described is not the exclusive domain of either gender. Undeniably, fire suppression activities are performed by women and men alike, not by firemen only.

Therefore, because our society now recognizes that firefighting tasks are performed by men and women, and because neither the "electronic researcher" nor the "politically correct" rationale constitutes a rational reason for continuing to use gender-specific language, I simply cannot understand the majority's desire to cling to the outmoded and factually incorrect term "fireman" to describe the rule.

### 2. *Dicta That the Firefighter's Rule Falls Within the Primary Assumption of Risk Doctrine*

I do not join in the dicta recited in footnote 4 of the majority opinion which expresses "the belief" that the firefighter's rule falls within the primary assumption of risk doctrine as enunciated in *Knight* v. *Jewett, supra,* 3 Cal.4th 296. The majority also cites the opinion in *Donohue* v. *San Francisco Housing Authority, supra,* 16 Cal.App.4th 658 at page 405 to support this proposition.

A review of *Knight* v. *Jewett* and *Donohue* v. *San Francisco Housing Authority* reveals, as the majority acknowledges, that the "firefighter's rule" was mentioned in footnote 5 of *Knight,* 3 Cal.4th at pages 309-310, only as an example that primary assumption of risk is not the same as "reasonable implied assumption of risk." In *Donohue* the court recognized the dicta in footnote 5 of *Knight* but opined: "Since *Knight* neither expanded nor restricted the scope of the [firefighter's rule] we must still determine its applicability here." (16 Cal.App.4th at p. 663.) It did so and after concluding that the rule was not a bar to the instant claim, it then considered whether, *under the circumstances of that case,* the primary or secondary assumption of the risk applied.

In contrast to *Donohue* v. *San Francisco Housing Authority, supra,* 16 Cal.App.4th 658, here the applicability of the defenses of "primary assumption of risk" and "secondary assumption of risk" was not raised as an issue by any party to this original proceeding, and our resolution of the questions of law at issue in this case, particularly the meaning of the Civil Code

section 1714.9 exception and its application to the undisputed facts, does not require an analysis and application of those defenses. Thus, while I have no objection to the majority's brief reference, in footnote 4, to the "firefighter's rule" requiring further examination in light of *Knight* v. *Jewett, supra,* 3 Cal.4th 296, I believe that footnote 4 unnecessarily engages in a limited examination and analysis of the rule based on "indications" from dicta in *Knight*. More importantly, it appears that the relationship of the "firefighter's rule" to the concepts of "primary" and "secondary" assumptions of risk newly enunciated in *Knight* as underlying the law of assumption of risk in California, will be considered by the California Supreme Court in *Neighbarger* v. *Irwin Industries, Inc.* (S033049, review granted July 23, 1993). Assuredly, we can await the ruling in that case without expressing our "beliefs" on such an important issue.

The petition of real parties in interest for review by the Supreme Court was denied October 28, 1993.